UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**08 CV 4067**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

NATIONAL INDEMNITY COMPANY,          :

               Plaintiff,          :

vs.          :

GREENWICH STREET INVESTMENTS II, L.L.C.,:
GREENWICH STREET CAPITAL PARTNERS II,  :
L.P., DP HOLDINGS L.L.C., DUKES PLACE   :
HOLDINGS L.L.C., DUKES PLACE HOLDINGS   :
LTD., DUKES PLACE HOLDINGS, L.P.,        :
ENSTAR GROUP LIMITED, and ENSTAR (US),   :
INC.,                                     :
                          :

              Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

RECEIVED
COMPLAINT
APR 3 0 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## PRELIMINARY STATEMENT

1.      Plaintiff National Indemnity Company ("NICO") seeks damages arising from (a) breaches of fiduciary duties by Defendants; and (b) Defendants' intentional interference with NICO's contract rights and business relationships.

2.      The Defendants' misdeeds as described in this Complaint arise from a conspiracy to deprive NICO through tortious means of its contractual rights with two other insurance companies, Seaton Insurance Company ("Seaton") and Stonewall Insurance Company ("Stonewall").

## THE PARTIES

3.      Plaintiff NICO is an insurance company organized under the laws of the state of Nebraska, with its principal place of business in Omaha, Nebraska.

4.      Defendant Greenwich Street Investments II, L.L.C. ("GSC Partners") is a group of private equity/hedge fund investors who possessed no meaningful experience in

the insurance or reinsurance industries prior to the events outlined in this Complaint. Among the individuals at GSC Partners that were/are involved in the events described herein are Fred Eckert, Sanjay Patel, Matthew Kaufman, and Mayur Patel. GSC Partners is organized under the laws of the state of Delaware, with its principal place of business in Florham Park, New Jersey.

5.     GSC Partners owns Defendant Greenwich Street Capital Partners II, L.P. ("Greenwich Fund"), which is a hedge fund. Greenwich Fund is organized under the laws of the state of Delaware, with its principal place of business in Florham Park, New Jersey.

6.     Defendant DP Holdings L.L.C. is organized under the laws of the state of Delaware, with its principal place of business in Florham Park, New Jersey.

7.     Defendant Dukes Place Holdings L.L.C. is organized under the laws of the state of Delaware, with its principal place of business in Florham Park, New Jersey.

8.     Defendant Dukes Place Holdings Ltd. is organized under the laws of Bermuda, with its principal place of business in Hamilton, Bermuda.

9.     Defendant Dukes Place Holdings, L.P. is a Bermuda Exempted Limited Partnership that was formed in 1996 for the specific purpose of acquiring insurance and reinsurance companies that are in claims "run-off" (*i.e.*, companies that no longer issue policies). (Dukes Place Holdings, L.P., DP Holdings L.L.C., Dukes Place Holdings L.L.C. and Dukes Place Holdings Ltd. are collectively referred to herein as "Dukes Place").

10.     GSC Partners is the general partner of Greenwich Fund. Greenwich Fund holds an 89.34% interest in Defendant DP Holdings L.L.C. Greenwich Fund is a

2

managing member and general partner of DP Holdings L.L.C. Greenwich Fund and DP Holdings L.L.C. together own 100% of Defendant Dukes Place Holdings L.L.C., with Greenwich Fund holding a 1% interest and DP Holdings L.L.C. holding a 99% interest. Greenwich Fund is a general partner of Dukes Place Holdings L.L.C.

11.    Dukes Place Holdings L.L.C. owns 100% of Defendant Dukes Place Holdings Ltd. Dukes Place Holdings Ltd. is a corporation organized under the laws of Bermuda to act as the general partner of Defendant Dukes Place Holdings, L.P., and holds a 1% interest in Dukes Place Holdings, L.P. DP Holdings, L.L.C. holds the remaining 99% interest in Dukes Place Holdings, L.P.

12.    In 1996, GSC Partners was involved in the formation of Dukes Place Holdings, L.P. The direct owner of Dukes Place Holdings, L.P. is the Greenwich Fund.

13.    Each of the Dukes Place entities owned by GSC Partners and Greenwich Fund is a shell corporation whose sole purpose is to hold stock of other entities owned by GSC Partners and Greenwich Fund. Dukes Place is dominated and controlled by Defendants GSC Partners and Greenwich Fund. (GSC Partners, Greenwich Fund and all of the Dukes Place companies named as Defendants are collectively referred to as the "GSC Entities.")

14.    Dukes Place Holdings, L.P. owns 100% of the stock of Stonewall Acquisition Corporation, a shell corporation that owns Seaton and Stonewall. Stonewall Acquisition Corporation was created on or about July 21, 2000, and 100% of the stock of Seaton and Stonewall was transferred to Stonewall Acquisition Corporation on or about September 29, 2000.

3

15.    Defendant Enstar Group Limited ("Enstar"), formerly known as

Castlewood Holdings, Ltd., is a holding company formed in 2001 for the purpose of

holding a number of subsidiaries in the business of administering claims against

insurance companies in run-off. Enstar is organized under the laws of Bermuda, with its

principal place of business in Hamilton, Bermuda.

16.    Defendant Enstar (US), Inc., formerly Castlewood Holdings (US), Inc.

("Castlewood"), is the U.S. subsidiary of Enstar, organized under the laws of the State of

Delaware, with its principal place of business in Warwick, Rhode Island.

17.    Seaton and Stonewall are shell corporations that do not have any

employees. All of their officers are employees of Castlewood. All of their directors are

employees of either Castlewood or the GSC Entities. At all times relevant to this

Complaint, Seaton and Stonewall were owned by the GSC Entities, and have been

administered by Castlewood.

## JURISDICTION AND VENUE

18.    Jurisdiction is appropriate under 28 U.S.C. § 1332 in that there is complete

diversity of citizenship and the amount in dispute, exclusive of interests and costs, is

greater than $75,000.

19.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391 in that the

Defendants' bad faith conduct culminated in concluded arbitrations, in which NICO

prevailed, that were conducted in New York, New York.

4

## GENERAL ALLEGATIONS

### Dukes Place's Purchase of Seaton and NICO's Reinsurance of Seaton

20. Pursuant to a Stock Purchase Agreement dated November 20, 1998, Dukes Place purchased Unigard Mutual Insurance Company (later renamed Seaton Insurance Company) from John Hancock Mutual Life Insurance Company.

21. At that time, Seaton was no longer actively writing policies. Instead, its business was confined to running off its existing insurance and reinsurance liabilities and collecting its own reinsurance. Seaton's liabilities and expenses were paid from reserves it had set aside for this purpose and from reinsurance collected on its reinsurance.

22. In order to accomplish its goal of purchasing Seaton, Dukes Place was required to obtain approval from the State of Washington Office of the Insurance Commissioner, which at that time had supervisory authority over Seaton.

23. In its application for approval, Dukes Place stressed that its acquisition of Seaton had as an integral element significant retroactive reinsurance coverage that it had asked NICO to underwrite in order to support the acquisition.

24. Pursuant to an Aggregate Retrocession of Loss Portfolio Agreement effective on or about March 29, 1999 (the "Seaton Reinsurance Agreement," attached as Exhibit A), NICO provided $327 million (later increased to $350 million) of reinsurance coverage to Seaton for all of Seaton's liabilities, including allocated loss adjustment expenses, declaratory judgment expenses and loss payments on all of its insurance and reinsurance business. Seaton also agreed to pay NICO $100,000 per year to assist in the administration of claims.

5

25. The Seaton Reinsurance Agreement provided enormous coverage that few, if any, insurers other than NICO were able to provide. NICO assumed up to $343 million in Seaton liabilities on insurance business already written.

26. This reinsurance coverage exposed NICO to large risks potentially without sufficient premium or investment income to cover those liabilities. Accordingly, in entering into this agreement, NICO was reliant upon the good faith of Seaton and its owners.

27. In order to protect NICO's interests, the parties agreed in Article 18 of the Seaton Reinsurance Agreement that "[i]n undertaking the obligations and responsibilities described herein, [Seaton] and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of [NICO]."

28. Also in order to protect NICO's interests, the Seaton Reinsurance Agreement gave NICO the right, *inter alia*, to approve all claims payments over $250,000.

**Dukes Place's Purchase of Stonewall and NICO's Reinsurance of Stonewall**

29. Pursuant to a Stock Purchase Agreement dated May 5, 2000, Dukes Place agreed to buy Stonewall.

30. Dukes Place expressly conditioned its purchase of Stonewall upon NICO's agreement to provide retroactive reinsurance coverage similar to that issued to Seaton. In its application for approval of the acquisition to the Ohio Department of Insurance, Dukes Place stressed that Eastgate Group Limited, an outside entity, would be providing administrative services to Dukes Place, supported by NICO's assistance in the administration of claims:

6

> In consequence, in administering the settlement of claims
> and the collection of the reinsurance recoveries, Eastgate
> management and staff will liaise with designated
> management of National Indemnity to ensure that: (a) all
> claims made upon Stonewall are properly adjusted and
> settled as and when they fall due for payment in accordance
> with policy terms and conditions; and (b) reinsurance
> recoveries from third party reinsurers are properly
> processed and collected as they are generated following
> settlement of underlying claims.

> Dukes Place believes that the combination of the resources,
> experience and expertise of Eastgate, supported by its
> parent corporation Eastgate Group Limited, backed up by
> the support of National Indemnity, will ensure that the run-
> off of the liabilities of Stonewall is fully resourced and well
> managed.

31.     NICO executed an Aggregate Reinsurance Agreement with Stonewall (the

"Stonewall Reinsurance Agreement," attached as Exhibit B) on or about May 5, 2000.

32.     Pursuant to the Stonewall Reinsurance Agreement, NICO provided

reinsurance coverage for all of Stonewall's liabilities, including allocated loss adjustment

expenses, declaratory judgment expenses and loss payments, up to a limit of $240 million

on insurance policies that Stonewall had already written.

33.     The Stonewall Reinsurance Agreement provided enormous coverage that

few, if any, insurers beyond NICO were able to provide.

34.     This reinsurance coverage exposed NICO to large risks potentially without

sufficient premium or investment income to cover those liabilities.  Accordingly, in

entering into this agreement, NICO was reliant upon the good faith of Stonewall and its

owners.

35.     Article 18 of the Stonewall Reinsurance Agreement ("Standard of Care")

states that "[i]n undertaking the obligations and responsibilities described herein,

[Stonewall] and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of [NICO]."

36.     Under the Stonewall Reinsurance Agreement, NICO has the right to associate in all claims and to approve claims above $150,000. Moreover, by subsequent letter agreement, Stonewall agreed to pay NICO $50,000 per year to assist in administration of Stonewall's claims, which amount was in addition to the $100,000 already being paid to NICO for assisting in the administration of the Seaton claims.

**Dukes Place Retains Eastgate to Conduct the Run-off of Seaton and Stonewall**

37.     At the time of the acquisition of Seaton and Stonewall, Dukes Place had no employees whatsoever and no officers or directors with insurance or reinsurance experience. Likewise, after the acquisition by Dukes Place, Seaton and Stonewall had no employees.

38.     Seaton, Stonewall and Dukes Place were under the domination and control of GSC Partners and Greenwich Fund.

39.     In order to conduct their business strategy, the GSC Entities caused Seaton and Stonewall to enter into agreements with Eastgate Group Limited ("Eastgate"), later renamed Cavell USA, Inc., for the administration of the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement (collectively, the "Reinsurance Agreements").

40.     The Agreement Relating to Administration of Run-Off Business between Seaton and Eastgate (the "Seaton Administration Agreement") declared Eastgate to be the "Claims Servicer" for Seaton's claims, but gave recognition to the fact that NICO would have day-to-day involvement in the settlement of claims:

> Eastgate will provide a representative of NIC with full time
> access to the Company's offices and records and to allow
> such representative to monitor the payment of claims and to

8

> assist Eastgate and the Company in the settlement of such
> claims. In addition, Eastgate will pay NIC for all salary,
> benefits and like costs and expenses associated with such
> representative, but not more than $100,000 per annum.

41.    Stonewall likewise entered into an Agreement Relating to Administration of Run-Off Business with Eastgate ("Stonewall Administration Agreement"), declaring Eastgate to be the "Claims Servicer" for Stonewall's claims.

42.    Article 4 of the Seaton Reinsurance Agreement expressly provides that NICO has complete control over the retention of any third-party entity to handle and administer Seaton's claims and that NICO would assume control over the adjusting of Seaton's liabilities should Dukes Place cease to own a controlling interest in Seaton.

43.    Article 4 of the Stonewall Reinsurance Agreement likewise expressly provides that NICO has complete control over the retention of any third-party entity to handle and administer Stonewall's claims and that, in the event Dukes Place should cease to own a controlling interest in Stonewall, then (other than Stonewall itself), no other party could administer Stonewall's claims without NICO's consent.

44.    Article 18 of both the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement provides that Eastgate, as Claims Servicer under the agreements, owes a fiduciary duty to NICO:

> In undertaking the obligations and responsibilities
> described herein, the Reinsured and Claims Servicer will
> have a fiduciary duty to act in utmost good faith to the
> interests of [NICO].

45.    Both the Seaton Administration Agreement and the Stonewall Administration Agreement expressly authorize Eastgate to sub-delegate any of its respective responsibilities to third parties.

### Dukes Place Decides to Sell Seaton and Stonewall

46.     In 2003, Dukes Place caused Seaton and Stonewall to change their respective states of domicile to Rhode Island from Washington and Ohio. In 2004, the owners of Stonewall and Seaton applied to the Rhode Island Department of Business Regulation (the "Rhode Island Insurance Department") for a dividend of at least $25 million.

47.     The Rhode Island Insurance Department never approved the request for a dividend.

48.     Sometime after it made the request for a dividend, Dukes Place endeavored to sell Seaton and Stonewall in order to extract its capital investment and profit from the transaction.

49.     The GSC Entities began to solicit interest from prospective buyers.

50.     Sometime in the summer of 2005, the GSC Entities found a conditional buyer in what was then known as Castlewood Holdings (US), Inc., now Enstar (US), Inc. (hereafter, "Castlewood").

51.     The GSC Entities on the one hand, and Castlewood on the other hand, originally intended for Castlewood or an affiliate to purchase 100% of Stonewall Acquisition Corporation, which was and is the immediate corporate parent of both Seaton and Stonewall.

52.     Castlewood's intent in purchasing 100% of Seaton and Stonewall was to become Claims Servicer for Seaton and Stonewall and to extract fees from those companies for that service.

53.     Thereafter, the GSC Entities on the one hand, and Castlewood on the other hand, came to the realization that – upon a 100% sale of Seaton and Stonewall – the

10

Reinsurance Agreements required that NICO have the right to approve a new Claims Servicer or become Claims Servicer itself.

54.     The GSC Entities on the one hand, and Castlewood on the other hand, recognized that Castlewood could not purchase more than 50% of the Companies without triggering NICO's absolute right under the Reinsurance Agreements to become Claims Servicer, thus precluding Castlewood's access to claims servicing fees.

55.     Because Castlewood wanted to earn the fees for itself, NICO's contract rights rendered Seaton and Stonewall "unsaleable" in the view of the GSC Entities and Castlewood.

56.     Despite concluding that Seaton and Stonewall were "unsaleable," starting around November 2005, Castlewood and its attorneys began conducting due diligence in Eastgate's offices for the purported purpose of determining whether Castlewood would purchase Seaton and Stonewall.

57.     At the direction of GSC Partners and Greenwich Fund, Dukes Place represented to NICO that Castlewood would be performing routine due diligence for the purpose of potentially acquiring an interest in Seaton and Stonewall.

58.     At the direction of GSC Partners and Greenwich Fund, Dukes Place requested that NICO's representatives cooperate with the Castlewood due diligence and, in particular, that NICO's representative Thomas Ryan agree to be interviewed by Castlewood's representatives about the conduct of Seaton's and Stonewall's claims administration.

59.     On or about December 14, 2005, Mr. Ryan was interviewed at length by attorneys for Castlewood.

60.    NICO and Mr. Ryan believed that Mr. Ryan was being interviewed for purposes of legitimate due diligence and therefore Mr. Ryan was not represented by counsel at this interview.

61.    NICO has since learned that – prior to this interview – the GSC Entities and Castlewood had agreed to "build a case" against NICO for purposes of coercing NICO to relinquish its contract rights, thereby clearing the way for the sale of Seaton and Stonewall to Castlewood.

62.    The interview of Mr. Ryan was conducted under false pretenses.

63.    Attorneys for Castlewood and the GSC Entities who conducted the interview of Mr. Ryan were adverse to the interests of NICO and Mr. Ryan at the time of the interview, but never revealed their adversity.

### Dukes Place and Castlewood Hatch a Scheme to Coerce NICO into Relinquishing Its Contract Rights

64.    What NICO and Mr. Ryan did not know at the time of the December 14, 2005 interview was that, in the fall of 2005, the GSC Entities on the one hand, and Castlewood on the other hand, had agreed to a scheme designed to improperly coerce NICO into relinquishing its contractual right to be Claims Servicer of Seaton and Stonewall in the event of a change of control of Seaton or Stonewall.

65.    On September 13, 2005, Paul O'Shea of Castlewood wrote a memorandum to Mayur Patel of GSC Partners, Greenwich Fund and Dukes Place, outlining the joint strategy for depriving NICO of its contract rights:

> • Integral to our being prepared to purchase Seaton and Stonewall is you agreeing to change manager of Seaton, Stonewall and Cavell immediately on the signing of the term sheet for sale of Seaton and Stonewall.

> • Together, Castlewood and Dukes Place need to agree a
> strategy to inform Berkshire Hathaway of your intention to
> sell Seaton and Stonewall to us and for Castlewood to meet
> with them to ensure that they do not exercise their right to
> take the management of the companies in-house for
> themselves.

66.    Mr. Patel reported the scheme in a December 21, 2005 e-mail that

memorialized his discussions with Mr. O'Shea. Mr. Patel first reported that Castlewood

proposed that it be permitted to purchase only 49% of Stonewall (and 0% of Seaton), to

"get control of all information" and then "approach NICO regarding a change of control."

67.    Mr. Patel responded to Castlewood's proposal by declaring the

requirement of the GSC Entities that Castlewood and its attorneys build a case against

NICO in order to coerce NICO into relinquishing its contract rights:

> I told him that we don't want to sell less than 100% of
> stonewall and then discussed a put call structure at the same
> price for the 51% to technically get us to the same place. I
> told him that we would think about it but preferred to focus
> on building a case against nico to force them to allow the
> stonewall transfer so that we could sell 100%. Rick/dan,
> we should see if smart can get started any sooner than jan
> so that we can build a case against nico asap.

68.    Castlewood accepted and agreed to the proposal of the GSC Entities to aid

and abet the breach of Seaton's and Stonewall's fiduciary duties to NICO and to interfere

with NICO's contract rights and economic advantage.

69.    On or about January 18, 2006, Seaton and Stonewall each entered into an

Agreement Relating to Administration of Run-Off Business with Castlewood

("Castlewood Administration Agreements"), whereby Castlewood agreed to administer

the Seaton and Stonewall Reinsurance Agreements.

70.    Section 2.2 of the Stonewall Castlewood Administration Agreement

(attached as Exhibit C) provides:

13

> Castlewood warrants that it has read the Reinsurance
> Agreement in its entirety, that the Reinsurance Agreement
> creates various rights and obligations with respect to the
> Run-Off Business between [Stonewall], on the one hand,
> and NIC, on the other.  Castlewood agrees to administer the
> Reinsurance Agreement consistent with [Stonewall's] rights
> and obligations under the Reinsurance Agreement.

71.     Likewise, Section 2.2 of the Seaton Castlewood Administration

Agreement (attached as Exhibit D) provides:

> Castlewood warrants that it has read the Reinsurance
> Agreements in their entirety, that the Reinsurance
> Agreements create various rights and obligations with
> respect to the Run-Off Business between [Seaton], on the
> one hand, and National Indemnity Company ("NIC"), on
> the other hand, and that Castlewood will at all times cause
> the services to be performed in a manner consistent with
> [Seaton's] rights and obligations under the Reinsurance
> Agreements.

72.     Among Seaton's and Stonewall's obligations under the Reinsurance

Agreements is the "fiduciary duty to act in utmost good faith to the interests of [NICO]"

found in Article 18.

73.     Castlewood formed an affiliate, Virginia Holdings Corporation, which,

together with Dukes Place (acting under the direction of principals of GSC Partners and

Greenwich Fund), entered into a Stock Purchase Agreement ("Castlewood SPA") on June

16, 2006, contractually binding Castlewood to coerce NICO to relinquish its right to be

Claims Servicer:

> The parties shall each use commercially reasonable efforts
> to cause Castlewood US to obtain, as expeditiously as
> possible, (i) [NICO's] consent to Castlewood US, or an
> Affiliate of Castlewood US, serving as the Claims Servicer
> (as such term is defined in the Stonewall Reinsurance
> Agreement) and (ii) [NICO's] waiver of its right to become
> the Claims Servicer (such consent and waiver, collectively,
> the "Reinsurer Consent"), with such Reinsurer Consent to
> be in a form mutually acceptable to Seller and Purchaser.

14

> For purposes of the covenants contained in Section 5.10,
> time is of the essence.

74.     The Castlewood SPA thus requires Castlewood to use its best efforts to force NICO to relinquish its contract rights.

75.     Under Defendants' scheme, if NICO could be forced to give up its contract right to be Claims Servicer, then Castlewood would purchase 100% of Seaton and Stonewall from Dukes Place.

76.     The GSC Entities agreed to allow Castlewood to use, without any limitation whatsoever, the policyholder surplus of Seaton and Stonewall for the purpose of coercing NICO to relinquish its contract rights.

77.     With the permission of the GSC Entities, Castlewood has spent millions of dollars of Seaton's and Stonewall's funds for the purpose of advancing spurious claims against NICO to effect the scheme.

78.     The expenditure of these funds is an abuse of Seaton's and Stonewall's surplus that has had the effect of depriving Seaton's and Stonewall's policyholders from the benefit of these funds.

79.     Dukes Place (at the direction of GSC Partners and Greenwich Fund) and Castlewood further agreed in the Castlewood SPA that, if they were successful in obtaining a monetary award of damages from NICO, these funds would become the property not of Seaton or Stonewall (despite the fact that Seaton and Stonewall were funding the litigation against NICO), but would be equally split between Castlewood on the one hand, and the GSC Entities on the other hand.

80.     The parties to the Castlewood SPA agreed that they would exercise their best efforts to obtain permission from the Rhode Island Insurance Department for Seaton

15

and Stonewall to pay any monetary damages obtained from NICO to Dukes Place and
Castlewood as a dividend within 15 days after receipt of any such damages.

**NICO Seeks Documents from the Defendants and Defendants Improperly Refuse,
Thus Necessitating NICO's Demand for Arbitration**

81.    After the interview of Mr. Ryan, NICO became increasingly concerned
that the GSC Entities were not acting honestly and in good faith towards NICO. This
was confirmed in a meeting between a representative of NICO and counsel to the GSC
Entities, who confirmed that they wished to sell Seaton and Stonewall and that they
wished NICO to comply with actions necessary to achieve the objectives of the GSC
Entities.

82.    In an attempt to lend ballast to claims by the GSC Entities that good faith
grievances had been developed by the GSC Entities about NICO's work on the Seaton
and Stonewall portfolios, counsel to the GSC Entities complained that the manner in
which NICO had indisputably *reduced* the legal fees incurred in defending claims against
Seaton and Stonewall was objectionable.

83.    Pursuant to the Access to Records clauses in the Reinsurance Agreements,
NICO sought access to records that might shed light on the true interest of Castlewood.

84.    Seaton and Stonewall, at the direction of the GSC Entities, denied NICO
access to any records or documents whatsoever, thereby concealing their scheme against
NICO.

85.    As a result, on January 4, 2006, NICO served separate arbitration demands
against Seaton and Stonewall pursuant to the arbitration clauses in the Reinsurance
Agreements, seeking access to documents that might shed light on the true interest of
Castlewood.

16

86.    NICO supplemented its arbitration demands on May 22, 2006.

87.    On June 22, 2006, Seaton and Stonewall each separately counterclaimed against NICO in the two arbitrations, seeking, *inter alia*, (a) rescission of the Reinsurance Agreements with NICO; (b) the right to service the claims; and (c) the right to collect amounts due from third-party reinsurers.

### Defendants Engage in Misrepresentations about NICO to the Rhode Island Insurance Department

88.    In the Spring and Summer of 2006, representatives of the GSC Entities on the one hand, and Castlewood on the other hand, were making ex parte representations to representatives of the Rhode Island Insurance Department regarding NICO's handling of Seaton and Stonewall claims.

89.    In the course of these communications, representatives of the GSC Entities on the one hand, and Castlewood on the other hand, falsely represented to the Rhode Island Insurance Department that NICO was improperly interfering with the claims presented to Seaton and Stonewall under policies that they had issued, and that NICO was acting in its own self-interest and against the interests of Seaton and Stonewall.

90.    The allegations made to the Rhode Island Insurance Department were meant to support false allegations made in anonymous e-mails to the Rhode Island Insurance Department regarding alleged improprieties in NICO's claims handling.

91.    The GSC Entities on the one hand, and Castlewood on the other hand, represented to the Rhode Island Insurance Department that the anonymous e-mails were of concern, despite their having concluded internally that they were almost entirely false.

92.    Despite the foregoing, the GSC Entities and Castlewood arranged for counsel to Seaton and Stonewall to represent to the arbitration panels in the proceedings

then pending that the allegations in the anonymous e-mails would be proven and, in an attempt to support their legitimacy, that the e-mails had been obtained from a state regulator, when in fact the GSC Entities and Castlewood had not been informed that any state regulator could legitimize any of the allegations in the anonymous correspondence.

93.    Castlewood and Dukes Place (at the direction of GSC Partners and Greenwich Fund) engaged an outside consultant to investigate the allegations contained in the anonymous e-mails.  That consultant found no evidence to support any allegations of improper claims handling by NICO.

94.    The GSC Entities and Castlewood have never informed the Rhode Island Insurance Department that their own internal analysis showed that the anonymous e-mails contained false allegations.

**Defendants Confirm Their True Purpose to NICO**

95.    In the fall of 2006, Dominic Sylvester, on behalf of Castlewood, met with representatives of NICO for the purpose of discussing the demands of the Defendants against NICO.

96.    Although the stated purpose of the meeting was to discuss settlement of the then-pending arbitrations between NICO and Seaton and Stonewall, no good faith settlement discussions occurred.

97.    Instead, Mr. Sylvester candidly informed NICO that Castlewood was prepared to pursue very ugly claims against NICO which would not reflect well on NICO's "AAA" status, and that while he "did not wish to use the word blackmail," he imagined that NICO would be prepared to pay a premium in order to avoid the airing of such allegations.

**Castlewood and Dukes Place Hire Robert Burns to Fabricate Claims Against NICO**

98.     Robert Burns was an employee of Eastgate who was terminated on November 17, 2005. Mr. Burns was thereafter unemployed.

99.     Castlewood's attorneys interviewed Mr. Burns to see if he would be willing to testify adversely to NICO if offered a job by Castlewood.

100.    Upon completion of the interview, counsel for Castlewood reported to Defendants that Mr. Burns was indeed willing to testify against NICO in return for a job.

101.    With this not-so-tacit agreement in place, Castlewood hired Mr. Burns as an employee with a single purpose: to testify against NICO in the arbitrations.

102.    Castlewood openly confessed to the Rhode Island Insurance Department that it hired Mr. Burns because he would be a "creditable witness" against NICO.

103.    Mr. Burns has admitted that he re-created and backdated a claim record document and inserted it into a Stonewall claim file. The falsified document in question purported to support Mr. Burns' complaints about how a Stonewall claim had been managed by NICO.

104.    Mr. Burns also admitted that, while still an employee with Eastgate, he violated internal controls so that payments could be made to a lawyer involved in a fraudulent billing scam.

105.    When Mr. Burns' complaints about NICO aroused the concern of Seaton's and Stonewall's auditors, Ernst & Young, Mr. Burns' boss at Castlewood, Robert Carlson, suggested to Ernst & Young that they disregard Mr. Burns' accusations against NICO because there were no facts to support them.

106.    Mr. Carlson advised Ernst & Young that Mr. Burns was a person of "limited scope and professional skills."

107.    These warnings by Mr. Carlson to Ernst & Young about Mr. Burns' credibility and skill were made by July 15, 2006.

108.    Nonetheless, the GSC Entities on the one hand, and Castlewood on the other hand, caused Seaton and Stonewall to continue to argue to the underlying arbitration panels in September 2006 and thereafter that Mr. Burns was a credible witness who would present proof against NICO concerning the very matters that the Defendants had internally concluded were baseless.

109.    Despite the foregoing, Castlewood retained Mr. Burns until after he testified against NICO in the Stonewall arbitration.

110.    Shortly after the conclusion of his testimony and almost immediately after vindication of NICO and repudiation of Castlewood in the arbitrations, on information and belief, Mr. Burns' employment with Castlewood was terminated.

111.    Thus, at the time Seaton and Stonewall were arguing to the arbitration panels that NICO's conduct was so egregious that NICO should be stripped of its contractual right to act as Claims Servicer, the Defendants knew that the allegations were false, but caused Seaton and Stonewall to make those arguments anyway.

112.    NICO concluded the arbitrations with Seaton and Stonewall in the Summer of 2007.

113.    The arbitration panels ruled in favor of NICO and these rulings were confirmed as judgments of this Court in November 2007 (07-CV-10363 and 07-CV-10349).

20

**Defendants Reveal that They Seek Leverage Against NICO and Therefore They Demand Arbitration Against NICO for the Same Relief**

114.     Several months after the arbitration awards were confirmed, Seaton and Stonewall communicated to NICO through a representative that NICO's success in the arbitrations meant that Seaton and Stonewall would need to again find a new leverage point – a self-described "silver bullet" – that would convince NICO that it should buy Seaton and Stonewall at a premium, permitting the GSC Entities and Castlewood to achieve their financial objectives.

115.     As threatened, Seaton and Stonewall, under the domination and control of Defendants, recently delivered the "silver bullet," commencing new arbitrations seeking the same relief from NICO and clearly based on the same allegations that were rejected in the Seaton and Stonewall arbitrations.

## COUNT I

## <u>BREACH OF FIDUCIARY DUTY</u>

116.     NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 115 as if fully set forth herein.

117.     Under Article 18 of both the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement, Seaton and Stonewall owed fiduciary duties to NICO.

118.     Because Seaton and Stonewall had no employees, they were at all times dominated and controlled by their owners and parent corporations, Defendants Dukes Place, Greenwich Fund and GSC Partners. By dominating and controlling Seaton and Stonewall, these Defendants were obligated to uphold the fiduciary duties owed to NICO by Seaton and Stonewall.

21

119.    Upon entering into the Castlewood Administration Agreements,

Defendant Castlewood agreed to administer the Reinsurance Agreements in accordance

with Seaton's and Stonewall's obligations under the Reinsurance Agreements, including

Seaton's and Stonewall's fiduciary duties to NICO. Castlewood therefore assumed a

fiduciary duty to NICO under the Reinsurance Agreements.

120.    NICO is a third party beneficiary under the Castlewood Administration

Agreements by virtue of Castlewood's agreement to accept a fiduciary duty to NICO as

laid out in the Reinsurance Agreements.

121.    As described more fully above, Defendants knowingly and intentionally

entered into a scheme to deprive NICO of its rights under the Reinsurance Agreements.

This scheme was in direct contravention of Defendants' "fiduciary duty to act in utmost

good faith to the interests" of NICO and was in bad faith.

122.    As a result of the Defendants' scheme and breach of fiduciary duty, NICO

suffered damages.

### COUNT II

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

123.    NICO realleges and incorporates by reference the allegations in

Paragraphs 1 to 122 as if fully set forth herein.

124.    Under Article 18 of both the Seaton Reinsurance Agreement and the

Stonewall Reinsurance Agreement, Seaton and Stonewall owed fiduciary duties to NICO.

125.    Defendants had knowledge of the fiduciary duties owed by Seaton and

Stonewall to NICO.

126. As described more fully above, Defendants knowingly and intentionally aided and abetted Seaton's, Stonewall's and Castlewood's breach of their fiduciary duties to NICO and deprived NICO of its rights under the Reinsurance Agreements.

127. As a result of the Defendants' scheme and breaches of fiduciary duty, NICO suffered damages.

## COUNT III

## BREACH OF CONTRACT

128. NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 127 as if fully set forth herein.

129. Upon entering into the Castlewood Administration Agreements, Defendant Castlewood agreed to administer the Reinsurance Agreements in accordance with Seaton's and Stonewall's obligations under the Reinsurance Agreements, including Seaton's and Stonewall's fiduciary duties to NICO.

130. Pursuant to Castlewood's assumption of a fiduciary duty to NICO, NICO is a third party beneficiary to the Castlewood Administration Agreements.

131. Castlewood breached the Administration Agreements when it failed to administer the Reinsurance Agreements in accordance with its fiduciary duty to NICO.

132. As a result of Castlewood's breach of the Administration Agreements, NICO suffered damages.

## COUNT IV

## INTERFERENCE WITH CONTRACT

133. NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 132 as if fully set forth herein.

134. Seaton and Stonewall entered into contractual relationships with NICO by virtue of the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement.

135. Defendants at all times were aware of the existence of the Reinsurance Agreements.

136. As described more fully above, Defendants knowingly and intentionally entered into a scheme to deprive NICO of its rights under the Reinsurance Agreements. This scheme resulted in actual breaches of the Reinsurance Agreements by Seaton and Stonewall. Defendants' scheme to cause Seaton and Stonewall to breach their contract tortiously interfered with NICO's rights under the Reinsurance Agreements.

137. But for Defendants' scheme to deprive NICO of its contract rights, the Reinsurance Agreements would not have been breached.

138. Defendants' actions in entering into the scheme were improper and undertaken with malicious intent to deprive NICO of its contractual rights.

139. As a result of the Defendants' scheme and breaches of the Reinsurance Agreements, NICO suffered damages.

## COUNT V

## INDUCING BREACH OF CONTRACT

140. NICO realleges and incorporates by reference the allegations in Paragraphs 1 to 139 as if fully set forth herein.

141. Seaton and Stonewall entered into contractual relationships with NICO by virtue of the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement.

142. Defendants at all times were aware of the existence of the Seaton Reinsurance Agreement and the Stonewall Reinsurance Agreement.

24

143.    As described more fully above, Defendants intentionally entered into a
scheme to deprive NICO of its rights under the Reinsurance Agreements and thereby
improperly procured breaches of the Reinsurance Agreements.

144.    Defendants' actions in entering into the scheme were improper and
undertaken with malicious intent to deprive NICO of its contractual rights.

145.    As a result of the Defendants' scheme and breaches of the Reinsurance
Agreements, NICO suffered damages.

## **PRAYER FOR RELIEF**

146.    WHEREFORE, NICO seeks the following relief:

A.    A judgment for damages, in an amount to be determined at trial,
arising from Defendants' breach of their fiduciary duties to NICO
under the Reinsurance Agreements.

B.    A judgment for damages, in an amount to be determined at trial,
arising from Defendants' aiding and abetting the breach of Seaton's
and Stonewall's fiduciary duties to NICO under the Reinsurance
Agreements.

C.    A judgment for damages, in an amount to be determined at trial,
arising from Castlewood's breach of its fiduciary duties to NICO as
third party beneficiary under the Seaton Administration Agreement
and the Stonewall Administration Agreement.

D.    A judgment for damages, in an amount to be determined at trial,
arising from Defendants' improper interference with NICO's

contractual relationships with Seaton and Stonewall under the

Reinsurance Agreements.

E.     A judgment for damages, in an amount to be determined at trial,

arising from Defendants' improper inducement of Seaton and

Stonewall to breach their respective Reinsurance Agreements with

NICO.

F.     Such other and further relief as the Court may deem equitable and

just, including costs and attorneys' fees pursuant to 28 U.S.C. §

1927.

Dated: April 30, 2008
     New York, New York

Respectfully submitted,

Clyde & Co US LLP

By: _____

Michael A. Knoerzer
The Chrysler Building
405 Lexington Avenue, 11th Floor
New York, New York 10174
(212) 710-3940

Dewey & LeBoeuf LLP

By: _____

John M. Nonna
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

*Attorneys for Plaintiff National Indemnity Company*

26

11/20/98   14:46   ☎203                                                      ☎014

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington


AGGREGATE RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA 1321

Ex. 4

08/97/2000 11:21 FAX                    DEBEVOISE & PLIMPTON                    ☒002/020

UNIGARD SECURITY INSURANCE COMPANY

of Seattle, Washington

AGGREGATE RETROCESSION OF LOSS PORTFOLIO AGREEMENT

NO. RA 1321

EXHIBIT A

This Aggregate Retrocession Loss Portfolio Agreement ("Retrocession") is made between UNIGARD SECURITY INSURANCE COMPANY, Seattle, Washington (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Retrocession shall incept on the Effective Date. This Retrocession shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Retrocession ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts.  The Retrocession shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

ARTICLE 2.  AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $327,000,000 (Three Hundred Twenty-Seven Million United States Dollars).  UNDER NO CIRCUMSTANCES WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $327,000,000 (THREE HUNDRED TWENTY-SEVEN MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS RETROCESSION.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Retrocession follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Retrocession.

ARTICLE 3.  EXCLUSIONS

A.  This Retrocession shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.  This Retrocession shall not cover any liability (a) in respect of the fraud of a director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts, not reinsured hereunder.

C.  This Retrocession shall not cover any Unallocated Loss Adjustment Expense.

D.  This Retrocession shall not cover any policyholder dividends or return premiums except to the extent Reinsured receives a full and final release from the Insured in consideration of such return premium.

E.  This Retrocession shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

F.  This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the FASR Book which relate to an occurrence on or after January 1, 1978 or, for claims made coverage, a claim made on or after January 1, 1978.  With respect to the FASR Book, this Retrocession excludes any

G. liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1977.

G. This Retrocession shall not cover any liability of Reinsured under insurance or reinsurance contracts, policies or binders included in the RA Book which relate to an occurrence on or after January 1, 1987 or, for claims made coverage, a claim made on or after January 1, 1987. With respect to the RA Book, this Retrocession excludes any liability of the Reinsured under insurance or reinsurance contracts issued after January 1, 1987.

H. This Retrocession shall not cover any liability excluded in the Insurance Policies/Reinsurance Contracts or as otherwise agreed between the Reinsured and Reinsurer.

ARTICLE 4.  DEFINITIONS

A. Wherever used in this Retrocession, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which the Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was included in the FASR Book prior to or on December 31, 1977, or in the RA Book prior to or on December 31, 1986. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the FASR Book or the RA Book (subject to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgement of the Reinsured in this regard.

B. Wherever used in this Retrocession, the term "FASR Book" shall mean any and all binders, policies of insurance and contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured insures or reinsures any portion of the risk written and which are included within the Facultative and Special Risks ("Allen Miller") Book.

C. Wherever used in this Retrocession, the term "RA Book" shall mean any and all binders, contracts of reinsurance and renewals and modifications thereof and all endorsements or riders thereto for which the Reinsured reinsures any portion of the risk written and which are included in the Reinsurance Assumed Book.

D. Wherever used in this Retrocession, the term "Ultimate Net Loss" shall mean that sum which has in fact been paid by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured. Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 3(B). Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs

incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

E.  Wherever used in this Retrocession, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Retrocession. Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

F.  Wherever used in this Retrocession, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

G.  Whenever used in this Retrocession, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

H.  Whenever used in this Retrocession, the term "Claims Servicer" shall mean Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, or such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of Reinsured.

I.  Whenever used in this Retrocession, "Effective Date" shall mean 12:01 a.m. Eastern Standard Time on the later of the 1) day of the closing of the acquisition of Reinsured by Dukes Place Holdings, L.P., and 2) the day Reinsurer receives the premium due under Article 6.

ARTICLE 5.   SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Retrocession is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or Insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/ Reinsurance Contracts.  The whole of any receipts of the Reinsurer, net of justifiable external expenses of collection, shall be credited for the sole benefit of the Reinsurer under this Article.  Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall aggressively take all steps reasonably necessary to collect from solvent reinsurers.  Reinsured shall promptly draw down all letters of credit, withdraw funds from trusts or charge collections against funds held to collect promptly amounts due Reinsured.

ARTICLE 6.   PREMIUM

As the consideration for the rights and obligations set forth in this Retrocession, Reinsurer agrees to accept and the Reinsured agrees to pay a premium of U.S. $191,000,000 (One Hundred Ninety-One Million United States Dollars).  Payment shall be made in immediately available U.S. funds by wire transfer to:

Norwest Bank Nebraska, N.A.
Omaha, Nebraska
ABA #104000058

Account No. 1150-001-492

It is understood and agreed that the premium stated in this Retrocession is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Retrocession as such charges are the responsibility of the Reinsured. The premium is non-refundable.

ARTICLE 7.    CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.

ARTICLE 8.    ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Retrocession to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the others in the course of the Retrocession do not constitute a waiver of any rights or remedies that the party has under this Retrocession to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Retrocession, and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Retrocession shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the Reinsurer. This Retrocession may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.

ARTICLE 9.    ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer at all reasonable times, all records of the Reinsured and Claims Servicer relating to this Retrocession. The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer at all reasonable times, all records to which the Reinsured or Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise. The Reinsurer shall have the right to examine and copy at any reasonable time all papers, books, accounts, documents, and other records of the Reinsured and Claims Servicer and records to which the Reinsured may have access, relating to the business covered by this Retrocession. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Retrocession. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

ARTICLE 10. WARRANTIES

Reinsured warrants and represents that it will not voluntarily undertake any material change in corporate structure, administrative practices in respect of the Insurance Policies/Reinsured Contracts which are reinsured under this Retrocession or its domicile, without prior written consent of the Reinsurer which consent will not be unreasonably withheld or delayed.

Reinsured warrants and represents that it will not buy any additional reinsurance protection in respect of any Insurance Policy/Reinsurance Contract either above or below this Retrocession without prior written consent of the Reinsurer which will not be unreasonably withheld or delayed.

ARTICLE 11. CONDITIONS

A. Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B. In addition to the Reinsurer's general right to associate as set forth in A. above, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any gross claim settlements or other payments covered by this Retrocession in excess of U.S. $250,000; (2) any payments not in settlement of specific claims, including insurance policy buy-backs, return premiums or commutations of assumed reinsurance obligations, in excess of U.S. $250,000; and (3) any commutations or assignments of ceded reinsurance regardless of value. With respect to items (1) and (2) herein, Reinsurer's approval shall not be unreasonably withheld or delayed.

C. No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsurer does not change in any manner that affects the interest of Reinsurer under this Retrocession; (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Retrocession and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given, Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Retrocession in a manner reasonably acceptable to Reinsurer.

In the event that, on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons, then Reinsurer shall have the right to become the Claims Servicer until this

Retrocession is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer.

In the event Reinsurer becomes the Claims Servicer, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expense it incurs as Claims Servicer.

For purposes of this Article 11, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 11, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 12.   OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Retrocession or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer. This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance.

## ARTICLE 13.   INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this Retrocession shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Retrocession shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/ Reinsurance Contracts. It is agreed, that the Liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 14.   ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Retrocession, including its formation and validity, and whether arising during or after the period of this Retrocession, shall be referred to an Arbitration Tribunal in the manner hereinafter set out. If a party, trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Retrocession). The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations. The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire. The respondent shall submit its brief within 20 days after receipt of the Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt of the respondent's brief. The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings. All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Retrocession. The arbitration shall be conducted in the English language. This Retrocession shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other

may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

ARTICLE 15.   NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Retrocession upon exhaustion of the Aggregate Limit or for any other reason.

ARTICLE 16.   NO RIGHTS OF THIRD PARTIES

Nothing in this Retrocession, express or implied, is intended, or shall be construed to confer upon or give to any person, firm or corporation, (other than the parties hereto and their permitted assigns or successors) any rights or remedies under or by reason of this Retrocession.

ARTICLE 17.   NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

National Indemnity Company
3024 Harney Street
Omaha, Nebraska  68131
Attn: General Counsel
Telecopy:  (402) 536-3265

Unigard Security Insurance Company
c/o Eastgate, Inc.
  44 Wall Street
  New York, NY 10005
  Attention: Mr. David Wallis
  Chief Executive Officer
  Telecopy: (212) 425-4564

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties.   Notice shall be deemed effective:

1.  if communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

2.  if sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

Article 18.   STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

ARTICLE 19.    ENTIRE AGREEMENT

The parties hereto agree that this Retrocession is not cancelable or voidable.  This Retrocession is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

ARTICLE 20.    REPORTS AND REMITTANCES

A.  Reports.  The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Retrocession within 45 days of the close of each calendar quarter (the "Quarterly Reports").  The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Retrocession and estimating receipts and disbursements for the following month.  The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Retrocession.

B.  Annual Statement.  As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

C.  Claims Account.  The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account").  The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time, in an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Retrocession.  In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Retrocession. Interest on funds in the Claims Account shall be the property of the Reinsurer.

ARTICLE 21.    RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the Underlying Claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate.

ARTICLE 22.    CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 10) the Reinsured is advised by a state insurance regulatory authority in which it is licensed or is an accredited reinsurer that, during the term of this Retrocession, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable state insurance regulatory authority in the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables

hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Retrocession in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities. The Reinsurer has sole discretion in which necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit. Interest and all other investment income on any funds posted as security pursuant to Article 22 shall be sole property of Reinsurer. In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California.

ARTICLE 23.   TERRITORY

The Retrocession shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

ARTICLE 24.   INTERMEDIARY

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Retrocession.

ARTICLE 25.   COUNTERPARTS

This Retrocession may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

ARTICLE 26. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _BOSTON_ , _MASS_ on this _20th_ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _Thomas E M[illegible]_
Title:

and at _____ , _____ on this ____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By _____             By _____
Title:                                       Dukes Place Holdings Ltd.
                                             as General Partner of
                                             Dukes Place Holdings L.P.

ARTICLE 26.  HEADINGS

 The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this \_\_\_\_\_ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY


By_____
Title:

and at _____, _____ on this \_\_\_ day of November, 1998.

NATIONAL INDEMNITY COMPANY


By_____
Title:

Acknowledged and Accepted:

Eastgate Group Limited    Dukes Place Holdings L.P.


By_____ By_____
Title:          Dukes Place Holdings Ltd.
             as General Partner of
             Dukes Place Holdings L.P.

ARTICLE 25.   HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____ . _____ on this ____ day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title:

and at _____ . _____ on this ____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited                          Dukes Place Holdings L.P.

By _____                             By _____
Title:                                          Dukes Place Holdings Ltd.
                                                as General Partner of
                                                Dukes Place Holdings L.P.

12 of 12

ARTICLE 26.   HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Retrocession.

Executed at _____, _____ on this 90th day of November, 1998.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title:

and at _____, _____ on this ____ day of November, 1998.

NATIONAL INDEMNITY COMPANY

By _____
Title:

Acknowledged and Accepted:

Eastgate Group Limited                          Dukes Place Holdings L.P.

By _____                             By _____
Title:                                          Dukes Place Holdings Ltd.
                                                as General Partner of
DIRECTOR                                         Dukes Place Holdings L.P.

12 of 12

<u>Amendment No. 1</u>

Unigard Security Insurance Company
of Seattle, Washington

Aggregate Retrocession of Loss Portfolio Agreement

No. RA 1321

This Agreement is hereby amended as follows:

<u>Article 12</u>

The last sentence of Article 12, which states "This right of offset shall apply regardless of whether either party was acting as assuming reinsurer or ceding reinsured or was acting in any other capacity related or not related to reinsurance" is deleted in its entirety.

<u>Article 13</u>

The second sentence of Article 13, which states "Reinsurer's liabilities hereunder shall not be accelerated or otherwise altered in timing or amount by reason of Reinsured's liquidation or insolvency" is deleted in its entirety. This deletion shall not be construed to create any right to accelerate or otherwise alter the timing or amount of Reinsurer's liabilities.

<u>Article 20</u>

The following is added as the last sentence of Article 20(c): "Reinsurer will settle its liabilities as due no less frequently than quarterly and payments will be made in cash."

<u>Article 21</u>

The following is added as the last sentence of Article 21, "Notwithstanding the foregoing, Reinsurer's reserves shall be no less than Reinsured's reserves on the Underlying Claims."

<u>Article 22</u>

The last sentence of Article 22, which states "In the event that the Reinsurer fails to take all such necessary steps, the Reinsured shall post a cash deposit equal to all of its outstanding liabilities under this Retrocession in a trust fund complying with applicable credit-for-reinsurance regulations of the Department of Insurance of New York and California" is deleted in its entirety.

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date set forth in the Agreement.

Page 1 of 2

05/07/2000 11:27 FAX                 DEBEVOISE & PLIMPTON                        @ 018/020

Executed at  New York  ,  New York  on this  31st  day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By_____
Title: Vice President

and at  Stamford ,  Connecticut  on this  29th  day of March, 1999.

NATIONAL INDEMNITY COMPANY

By_____
Title: Brian G. Smith
       Vice President

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.


By_____            By_____
Title:                                 Dukes Place Holdings Ltd.
                                       as General Partner of
                                       Dukes Place Holdings L.P.


Page 2 of 2

08/07/2000 11:27 FAX                    DEBEVOISE & PLIMPTON                    ☒018/020

Executed at _____, _____ on this ____ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _____
Title: _VICE PRESIDENT_

and at _Stamford_, _Connecticut_ on this _29th_ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _____
Title: _____

Acknowledged and Accepted:

Eastgate Group Limited                                    Dukes Place Holdings L.P.

By _____            By _____
Title: _DIRECTOR_                                        Dukes Place Holdings Ltd.
                                                        as General Partner of
                                                        Dukes Place Holdings L.P.

Page 2 of 2

05/07/2000 11:27 FAX            DEBEVOISE & PLIMPTON                    ☑020/020

03 29 99  16:03    ☎203

Executed at _New York_ , _New York_ on this _31st_ day of March, 1999.

UNIGARD SECURITY INSURANCE COMPANY

By _[signature]_

Title: _VICE PRESIDENT_

and at _Stamford_ , _Connecticut_ on this _29th_ day of March, 1999.

NATIONAL INDEMNITY COMPANY

By _[signature]_

Title: _BRIAN SNOVER_
_VICE PRESIDENT_

Acknowledged and Accepted:

Eastgate Group Limited                    Dukes Place Holdings L.P.

By _____          By _[signature]_
Title: _____        Dukes Place Holdings Ltd.
                                        as General Partner of
                                        Dukes Place Holdings L.P.

Page 2 of 2

5/04/2000 17:39 FAX 212 909 6836    DEBEVOISE & PLIMPTON    FAX NO.
MAY-05-2000 FRI 02:04 PM

RA-1385

AGGREGATE REINSURANCE AGREEMENT

between

STONEWALL INSURANCE COMPANY,

Cincinnati, Ohio

and

NATIONAL INDEMNITY COMPANY

Omaha, Nebraska

MICHAEL FRIEDMAN, CSR

NO.: 24

DATE: 3 / 6 / 07

Contract No. RA 1385

0/04/2000 17:39 FAX 212 909 6836    DEBEVOISE & PLIMPTON    FAX NO.

MAY-05-2000 FRI 02:04 PM

This Aggregate Reinsurance Agreement ("Reinsurance") is made between Stonewall Insurance Company, Cincinnati, Ohio (the "Reinsured") and National Indemnity Company, Omaha, Nebraska (the "Reinsurer").

## ARTICLE 1.  EFFECTIVE DATE AND TERMS OF AGREEMENT

The Reinsurance shall take effect on the Effective Date. This Reinsurance shall expire at the earlier of: (i) the payment by Reinsurer of the aggregate limit of liability provided for in Article 2 of this Reinsurance ("the Aggregate Limit"); or (ii) the extinguishment of all liabilities under all Insurance Policies/Reinsurance Contracts. The Reinsurance shall be subject to receipt of all necessary approvals from state insurance regulatory authorities.

## ARTICLE 2.  AGGREGATE LIMIT

Reinsurer hereby agrees to reimburse the Reinsured for Ultimate Net Loss paid by the Reinsured up to U.S. $240,000,000. UNDER NO CIRCUMSTANCE WILL THE REINSURER BE LIABLE FOR MORE THAN U.S. $240,000,000 (TWO HUNDRED AND FORTY MILLION UNITED STATES DOLLARS) IN THE AGGREGATE BY REASON OF ENTERING INTO THIS REINSURANCE.

The Reinsured and Reinsurer confirm that it is their mutual intent that the Reinsurer's liabilities under this Reinsurance follow from and are identical to any and all liabilities of the Reinsured for Ultimate Net Loss under the Insurance Policies/Reinsurance Contracts, subject to the terms, conditions, exclusions and Aggregate Limit of this Reinsurance.

## ARTICLE 3.  EXCLUSIONS

A.  This Reinsurance shall not cover any liability under any Insurance Policy/Reinsurance Contract paid by Reinsured before the Effective Date as determined by the books and records of Reinsured or which should have been booked as paid prior to the Effective Date.

B.  In addition to Article 3(A) above, this Reinsurance shall not cover any sums which, after application of best practice procedures for the adjustment and settlement of claims in accordance with the terms and conditions of an Insurance Policy/Reinsurance Contract, should have been paid or which should have been booked as paid in the books and records of Reinsured prior to the Effective Date. This Article 3(B) shall be capped at $4,000,000 net of applicable reinsurance (other than this Reinsurance) and shall expire two years from the date of Reinsurer's receipt of Premium under Article 6 of this Reinsurance.

C.  This Reinsurance shall not cover any liability (a) in respect of the fraud of a

10/04/2000 17:39 FAX 212 909 6836   DEBEVOISE & PLIMPTON   FAX NO.   P. 04
MAY-05-2000 FRI 02:05 PM

director, officer or employee of the Reinsured and/or Claims Servicer acting individually or collectively or acting in collusion with another individual or corporation or any other organization or party involved in the presentation, defense or settlement of any claim; or (b) in respect of any tortious act of the Reinsured and/or Claims Servicer in bad faith in connection with any insurance policies or reinsurance contracts not reinsured hereunder.

D. This Reinsurance shall not cover any Unallocated Loss Adjustment Expense.

E. This Reinsurance shall not cover any policyholder dividends, return premiums and retrospective or loss sensitive premiums (except reinstatement or adjustment premiums (1) paid in connection with reinsurance inuring to the benefit of the Reinsurer with respect to risks reinsured under this Reinsurance or (2) where the payment of such amounts benefits the Reinsurer either by way of reduction in the net present value of the liabilities of the Reinsurer with respect to risks reinsured under this Reinsurance or by increasing reinsurance recoverables or coverage available to the Reinsurer hereunder in an amount greater than the dividend or premium.

F. This Reinsurance shall not cover any tax, whether the tax is denominated as an income tax, excise tax, premium tax, surplus lines tax or any other tax assessment.

G. This Reinsurance shall not cover any liability incurred by the Reinsured under insurance or reinsurance contracts, policies or binders which incepted after January 1, 1992.

H. This Reinsurance shall not cover any liability with respect to occurrences or, for claims-made exposures, claims made, which are properly allocated to insurance or reinsurance contracts, policies or binders which incepted after January 1, 1992.

## ARTICLE 4. DEFINITIONS

A. Wherever used in this Reinsurance, the term "Insurance Policy/ Reinsurance Contract" shall mean any and all binders, insurance policies, contracts of insurance or reinsurance and renewals or modifications thereof and all endorsements or riders thereto for which Reinsured insured or reinsured any portion of the risk if such insurance or reinsurance was issued on or prior to January 1, 1992. The Reinsured shall be the sole judge as to what constitutes a claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance and as to the Reinsured's liability thereunder and as to the amount or amounts which it shall be proper for the Reinsured to pay thereunder, and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured as to the liability and obligation of the Reinsured under the Insurance Policies/Reinsurance Contracts reinsured under

**Page 3**

10/04/2000 17:39 FAX 212 909 6836    DEBEVOISE & PLIMPTON
FAX NO.
MAY-05-2000 FRI 02:05 PM

this Reinsurance, subject to the terms, exclusions and conditions hereof. Furthermore, the Reinsured shall be the sole judge as to whether a binder, policy of insurance, contract of insurance, renewals or modifications thereof, or endorsements or riders thereto are included within the scope of business covered hereunder (subject always to the terms, exclusions and conditions hereof), and the Reinsurer shall be bound by the reasonable, good faith judgment of the Reinsured in this regard.

B.    Wherever used in this Reinsurance, the term "Ultimate Net Loss" shall mean (1) that sum which is paid or payable by the Reinsured on or after the Effective Date, in settlement or satisfaction of Underlying Claims after making deductions for all salvage, subrogation, reinsurance collected and any other applicable funds held, trust funds, claims against insolvent estates, letters of credit or other applicable security as and when such deductions are converted to cash by the Reinsured; and (2) the amounts excepted from the exclusion in Article 3(E).  Ultimate Net Loss shall include any liabilities of the Reinsured for any tortious acts or any action of the Reinsured in bad faith, except as set forth in Article 3(C).  Ultimate Net Loss shall include Allocated Loss Adjustment Expense; and all such costs incurred in connection with coverage disputes including justifiable litigation and arbitration costs. Ultimate Net Loss shall not include Unallocated Loss Adjustment Expense.

C.    Wherever used in this Reinsurance, the term "Allocated Loss Adjustment Expenses" shall mean all court, arbitration, mediation or other dispute resolution costs, attorneys' fees, expenses, costs (including but not limited to the costs of supersedeas and appeal bonds) and pre- and post-judgment interest (excluding any overhead, internal costs, staff costs and similar expenses of the Reinsured or the Claims Servicer and excluding any fees of the Claims Servicer) incurred in connection with the defense, investigation, litigation, appeal, appraisal, adjustment, settlement or audit of or negotiations in relation to any claim or loss covered by the Insurance Policies/Reinsurance Contracts reinsured under this Reinsurance.  Any loss adjustment expenses which are not Allocated Loss Adjustment Expenses shall be "Unallocated Loss Adjustment Expenses".

D.    Wherever used in this Reinsurance, the term "Underlying Claims" shall mean all the liabilities and obligations of Reinsured (including but not limited to punitive and exemplary damages to the extent covered hereunder) arising under any Insurance Policy/Reinsurance Contract.

E.    Whenever used in this Reinsurance, the term "Insured" shall mean an insured or cedent under an Insurance Policy/Reinsurance Contract.

F.    Whenever used in this Reinsurance, the term "Claims Servicer" shall mean (1) the Reinsured; (2) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof; or (3) such other person as Reinsurer approves in writing to manage Underlying Claims on behalf of the Reinsured.

**Page 4**

G.  Whenever used in this Reinsurance, "Effective Date" shall mean 12:01 a.m. Eastern Standard Time on May 1, 2000.

H.  Whenever used in this Reinsurance, "Acquisition" shall mean the acquisition of the Reinsured by Dukes Place Holdings, L.P. pursuant to the Stock Purchase Agreement entered into between Great American Insurance Company and Dukes Place Holdings, L.P.

I.  Whenever used in this Reinsurance, "Closing" shall mean the closing of the Acquisition.

J.  Whenever used in this Reinsurance, "Closing Date" shall mean the date of the Closing.

## ARTICLE 5.   SALVAGES AND SUBROGATION AND OTHER RECOVERIES

For so long as this Reinsurance is in effect and thereafter as provided herein, the Reinsurer shall be subrogated to all of the rights of the Reinsured against any person or entity liable to the Reinsured or insured in respect of the Ultimate Net Loss and Reinsurer shall be entitled to any reinsurance recoverables, salvage or subrogation to which Reinsured would be entitled under the Insurance Policies/ Reinsurance Contracts with respect to claims paid or reimbursed by Reinsurer to Reinsured under this Reinsurance. It is understood and agreed that reinsurance recoverables, salvage and subrogation in respect of claims paid by the Reinsured prior to the Effective Date (as determined by the books and records of the Reinsured or which should have been booked as paid prior to the Effective Date) shall be the property of the Reinsured, up to the amount recorded in Reinsured's closing balance sheet delivered following the Closing in accordance with the Stock Purchase Agreement.  All sums in excess of such cap shall be solely for the account of the Reinsured.  The whole of any receipts for the account of the Reinsurer under this Article shall be credited for the sole benefit of the Reinsurer, net of justifiable external expenses of collection. Reinsured shall timely file and pursue to collection, to the extent possible, all claims against financially impaired or insolvent reinsurers, and shall take all steps reasonably necessary to collect from solvent reinsurers; including drawing down all letters of credit, withdrawing funds from trusts or charging collections against funds held to collect amounts due Reinsured.

## ARTICLE 6.   PREMIUM

As the consideration for the rights and obligations set forth in this Reinsurance, Reinsurer agrees to accept and the Reinsured agrees to pay (i) a minimum base premium of U.S. $126 million (one hundred and twenty-six million United States Dollars); plus, in addition thereto, an amount equal to 7.5% of the base premium calculated on a per annum basis from the Effective Date through the date of receipt of the full amount of the premium by Reinsurer.  Payment shall be made in immediately available U.S. funds

10/04/2000 17:40 FAX 212 909 6836    DEBEVOISE & PLIMPTON    P. 07
MAY-05-2000 FRI 02:08 PM                FAX NO.

by wire transfer to:

       Norwest Bank Nebraska, N.A.
       Omaha, Nebraska
       ABA #104000058
       Account No. 1150-001-492

It is understood and agreed that the premium stated in this Reinsurance is net to the Reinsurer of any taxes, expenses, brokerages or other charges (with the exception of Reinsurer's income taxes) in connection with this Reinsurance as such charges are the responsibility of the Reinsured, and further that the premium shall not be subject to any offsets or other reductions. The premium is non-refundable. The premium will be paid to the Reinsurer on or before the Closing Date, subject to a December 31, 2000 termination date.

Upon Reinsurer's receipt of the premium, Reinsurer will immediately reimburse Reinsured for Ultimate Net Loss paid by Reinsured on and after the Effective Date, for and only to the extent that reinsurance is otherwise provided hereunder, less all reinsurance recoveries, salvage and subrogation received by Reinsurer arising out of the payment of such Ultimate Net Loss for the period from and including the Effective Date to and including the Closing Date.

## ARTICLE 7. CURRENCY

For the purpose of measuring erosion of the Aggregate Limit, payments by Reinsurer hereunder in currencies other than U.S. dollars shall be converted into U.S. dollars at the rate of exchange used in Reinsurer's books on the date the reinsurance payment is made by the Reinsurer.

## ARTICLE 8. ERRORS AND OMISSIONS/NON-WAIVER

Any inadvertent error or omission on the part of the Reinsured or the Reinsurer shall not relieve the other party hereto from any liability which would have attached hereunder, provided that such error or omission is rectified as soon as possible after discovery. Payment by the Reinsurer does not constitute a waiver of any rights or remedies it may have under this Reinsurance to rectify any incorrect payment or any payment which is found not to be due. Reports submitted by one party hereto to the others in the course of the Reinsurance do not constitute a waiver of any rights or remedies that the party has under this Reinsurance to rectify any incorrect reports. Nevertheless, nothing contained in this Article shall be held to override the terms and conditions of this Reinsurance, and no liability shall be imposed on either party hereto greater than would have attached had such error or omission not occurred.

The terms of this Reinsurance shall not be waived, modified or changed except by written amendment executed by a duly authorized officer of the Reinsured and the

10/04/2000 17:40 FAX 212 909 6836    DEBEVOISE & PLIMPTON    FAX NO.    P. 08
MAY-05-2000 FRI 02:06 PM

Reinsurer. This Reinsurance may not be assigned by Reinsured or the Reinsurer without the prior written consent of the other party hereto.

## ARTICLE 9. ACCESS TO RECORDS

The Reinsured (including the Claims Servicer) shall make available for inspection, and place at the disposal of the Reinsurer during normal business hours, all records of the Reinsured and Claims Servicer relating to this Reinsurance. The Reinsured and Claims Servicer shall also make available for inspection and place at the disposal of the Reinsurer during normal business hours, all records to which the Reinsured or Claims Servicer may have access, by terms of any reinsurance agreement, insurance policy or otherwise. The Reinsurer shall have the right to examine and copy during normal business hours all papers, books, accounts, documents, and other records of the Reinsured and Claims Servicer and records to which the Reinsured may have access, relating to the business covered by this Reinsurance. It is agreed that Reinsurer's right of access to records shall continue as long as either party hereto has a claim against the other arising out of this Reinsurance. The Reinsured's contract with the Claims Servicer shall secure to Reinsurer the inspection rights provided in this Article.

## ARTICLE 10. WARRANTIES

Reinsured warrants and represents that it will not voluntarily change its domicile without prior written consent of the Reinsurer, which consent will not be unreasonably withheld or delayed.

In the event that, following the Effective Date, the Reinsured buys any additional reinsurance or retrocessional protection in respect of any Insurance Policy/Reinsurance Contract reinsured under this Reinsurance, this Reinsurance will automatically become excess of such additional reinsurance or retrocessional protection.

## ARTICLE 11. CONDITIONS

A.  With effect from the Effective Date, Reinsurer shall have the right to associate in the adjustment of all Underlying Claims.

B.  In addition to the Reinsurer's general right to associate as set forth in A. above, and with effect from the Effective Date, the Reinsurer's approval shall be obtained by the Reinsured prior to committing to the payment and/or settlement of (1) any individual gross claim settlement, quarterly account settlements or other payments in respect of the adjustment of Underlying Claims covered by this Reinsurance in excess of U.S. $150,000; (2) any insurance policy buy-back, return premium, commutation or like payment in excess of U.S. $250,000; and (3) any commutations or assignment of ceded reinsurance regardless of value. With respect to items (1) and (2) herein,

**Page 7**

/04/2000 17:40 FAX 212 909 6836    DEBEVOISE PLIMPTON    FAX NO.
MAY-05-2000 FRI 02:06 PM

Reinsurer's approval shall not be unreasonably withheld or delayed.

C.   If Reinsurer fails to approve any payment or settlement of an Underlying Claim for which Reinsurer's approval is required, and has in fact been sought, within a reasonable period of time following submission for approval to the Reinsurer, despite Reinsured's reasonable efforts to obtain such approval, during the period from the Effective Date to the Closing Date, Reinsurer agrees to indemnify and defend Reinsured from any and all losses, liabilities or reasonable expenses directly arising out of Reinsurer's failure to so approve the payment or settlement. It shall be a condition precedent of Reinsurer's obligation in this regard that Reinsured shall give Reinsurer immediate notice of any facts or circumstances likely to give rise to an indemnification or defense obligation of the Reinsurer, and Reinsurer shall furthermore have the right but not the obligation to assume direct control of negotiation, litigation, or settlement of any such loss or liability. Reinsured shall be obligated to cooperate with Reinsurer in this regard. This Article 11(C) shall survive termination hereof for any reason including the failure to consummate the Closing.

D.   No person may serve as Claims Servicer or otherwise manage the Underlying Claims other than the Reinsured or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, without the prior written consent of Reinsurer. In the event that, prior to the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities (defined below) of Reinsured to any other person or persons, then Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, shall continue to serve as Claims Servicer or otherwise manage the Underlying Claims with the prior consent of Reinsurer (which consent shall not be unreasonably withheld or delayed), provided that (1) Dukes Place Holdings L.P. is the single largest owner of the Voting Securities of Reinsured and owns 20% (twenty percent) or more of the Voting Securities of Reinsured; (2) the agreement under which Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, acts as Claims Servicer for Reinsured does not change in any manner that affects the interest of Reinsurer under this Reinsurance, (3) Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, in its capacity as Claims Servicer shall have complied with the terms of this Reinsurance and shall continue to comply with such terms, and (4) the performance of Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as Claims Servicer has been reasonably satisfactory to Reinsurer, in all material respects, since the Effective Date. If Reinsurer's consent is not so given, then Reinsurer shall have the right to become the Claims Servicer until this Reinsurance is exhausted under the same terms and conditions as Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, served as Claims Servicer. In the event Reinsurer's consent is so given, the four conditions set forth in this paragraph are continuing conditions precedent to Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, maintaining its position as Claims Servicer. Moreover, in the event Reinsurer's consent is so given,

/04/2000 17:40 FAX 212 909 6836    DEBEVOISE and PLIMPTON    FAX NO.
MAY-05-2000 FRI 02:07 PM

Reinsurer shall still have the right to become the Claim Servicer in the event Dukes Place Holdings L.P. and/or Eastgate Group Limited, or any wholly-owned affiliate or subsidiary thereof, as the case may be, fails to maintain or perform the obligations set forth in this Reinsurance in a manner reasonably acceptable to Reinsurer.

In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer.

If at any time after the Effective Date, Reinsurer becomes the Claims Servicer and the Run-Off Agreement is no longer in force, Reinsured shall reimburse Reinsurer for all Unallocated Loss Adjustment Expenses it incurs as Claims Servicer.

For purposes of this Article 11, the term "Voting Security" means any security or other instrument which has the power to vote at a meeting of shareholders or other instrument which has the power to vote at a meeting of shareholders of a person for or against the election of directors or any other matter involving the direction of the management and policies of such person. In the event Reinsured issues any "super voting" security or instrument, or any other security or instrument in which the voting rights do not equal the ownership rights, Reinsurer shall have the right to become the Claims Servicer. For purposes of this Article 11, "sells" shall be read broadly to include any exchange, including a swap or like transaction, which transfers control and/or financial interest in the Voting Securities of the Reinsured.

## ARTICLE 12. OFFSET

The Reinsured or the Reinsurer may each offset any balance(s) which may become due to the other party against other liabilities due from that other party. This offset right shall apply regardless of whether the balances arose on account of premium, commission, claims, losses, Allocated Loss Adjustment Expense, salvage or any other amount(s) due from one party to the other under this Reinsurance or under any other agreement heretofore or hereafter entered into between the Reinsured and the Reinsurer.

## ARTICLE 13. INSOLVENCY OF THE REINSURED

In the event of insolvency of the Reinsured, the reinsurance provided by this

10/04/2000 17:41 FAX 212 909 6836    DEBEVOISE & PLIMPTON    FAX NO.
MAY-05-2000 FRI 02:07 PM

Reinsurance shall be payable by the Reinsurer on the basis of the liability of the Reinsured as respects the Insurance Policies/Reinsured Contracts reinsured hereunder, without diminution because of the insolvency, directly to the Reinsured or its conservator, liquidator, receiver, or statutory successor. In the event of the liquidation or insolvency of the Reinsured, Reinsurer's liability under this Reinsurance shall be to make payments to or on behalf of Reinsured as and when due under the terms of the Insurance Policies/ Reinsurance Contracts. It is agreed, that the liquidator, receiver, conservator, or statutory successor of the Reinsured shall give written notice to the Reinsurer of the pendency of a claim against the Reinsured indicating the Insured, which claim would involve a possible liability on the part of the Reinsurer within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim, the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Reinsured or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to the approval of the court, against the Reinsured as part of the expense of liquidation to the extent of a pro rata share of the benefit which may accrue to the Reinsured solely as a result of the defense undertaken by the Reinsurer.

## ARTICLE 14. ARBITRATION

All matters in difference between the Reinsured and the Reinsurer in relation to this Reinsurance, including its formation and validity, and whether arising during or after the period of this Reinsurance, shall be referred to an Arbitration Tribunal in the manner hereinafter set out. If a trustee, receiver, rehabilitator, liquidator or conservator (including any insurance regulatory agency or authority acting in such a capacity) is appointed for either Reinsured or Reinsurer, the parties shall continue to be obligated to resolve any claim, dispute or cause of action subject to this Article 14 by arbitration.

Unless the parties agree upon a single arbitrator within thirty days of one receiving a written request from the other for arbitration, the Claimant (the party requesting Arbitration) shall appoint his arbitrator and give written notice thereof to the Respondent (the other party to this Reinsurance). The Respondent shall appoint his arbitrator and give written notice thereof to the Claimant. The two arbitrators shall agree upon the selection of an Umpire.

If the two arbitrators are unable to agree upon an umpire, each party shall select three nominees for umpire within thirty days after receipt of a joint notice from the arbitrators that they are unable to agree upon an umpire. Each party shall have the right to strike two of the umpire nominees selected by the other party within thirty days of receipt of the nominations. The umpire shall be selected between the remaining nominee of each party by lot.

The Claimant shall submit its initial brief within 20 days from appointment of the Umpire. The respondent shall submit its brief within 20 days after receipt of Claimant's brief and the Claimant shall submit a reply brief within 10 days after receipt

10/04/2000 17:41 FAX 212 909 6836    DEBEVOISE & PLIMPTON    FAX NO.

MAY-05-2000 FRI 02:06 PM

of the respondent's brief. The Arbitration Tribunal shall make its decision solely as to the issue presented in the notice of arbitration within 60 days following the termination of the hearings. All deadlines set forth in this paragraph may be extended by the Arbitration Tribunal in any manner that it may deem just and proper upon the application of either party.

Unless the parties otherwise agree, the Arbitration Tribunal shall consist of persons who are disinterested, active or retired senior executives of insurance or reinsurance companies.

The Arbitration Tribunal shall have power to fix all procedural rules for the holding of the Arbitration including discretionary power to make orders as to any matters which it may consider proper in the circumstances of the case with regard to pleadings, discovery, inspection of documents, examination of witnesses and any other matter whatsoever relating to the conduct of the Arbitration and may receive and act upon such evidence whether oral or written strictly admissible or not as it shall in its discretion think fit.

Each party shall bear the costs of its own arbitrator and shall share equally in the costs of the Umpire. All other costs of the arbitration shall be paid as directed by the Arbitration Tribunal, who shall direct to and by whom and in what manner they shall be paid.

The seat of the Arbitration shall be in New York, New York, and the Arbitration Tribunal shall apply the laws of New York (without regard to conflict of laws principles) as the proper law of this Reinsurance. The arbitration shall be conducted in the English language. This Reinsurance shall be governed by the laws of the State of New York, without regard to conflict of laws principles.

The Arbitration Tribunal may not award exemplary, punitive, multiple or other damages of a similar nature.

The award of the Arbitration Tribunal (by simple majority) shall be in writing and final and binding upon the parties who covenant to carry out the same. If either of the parties should fail to carry out any award the other may apply for its enforcement to any court having jurisdiction thereof or having jurisdiction over the parties or their assets.

## ARTICLE 15. NO REINSTATEMENTS

The Reinsured shall have no right to reinstate coverage under this Reinsurance upon exhaustion of the Aggregate Limit or for any other reason.

## ARTICLE 16. NO RIGHTS OF THIRD PARTIES

Nothing in this Reinsurance, express or implied, is intended, or shall be construed

Case 1:08-cv-04067-RWS     Document 4-31     Filed 04/30/2008     Page 12 of 23
10/04/2000 17:41 FAX 212 509 6830                                    FAX NO.
MAY-05-2000 FRI 02:08 PM

to confer upon or give to any person, firm or corporation (other than the parties hereto and their permitted assigns or successors), any rights or remedies under or by reason of this Reinsurance.

## ARTICLE 17.  NOTICES

All notices to another party hereto shall be in writing and sent by telecopier, or by certified mail, return receipt requested, and addressed to the party to whom addressed, as follows:

> National Indemnity Company
> 3024 Harney Street
> Omaha, Nebraska  68131
> Attn: General Counsel
> Telecopy:  (402) 536-3265

> To the Reinsured (1) from the Effective Date to (but not including) the Closing Date, and (2) anytime if there is no Closing:

> Great American Insurance Company
> 580 Walnut Street
> Cincinnati, Ohio  45202
> Attn:  Eve Cutler Rosen, Esq.
> Telecopy:  (513) 369-3655

> To the Reinsured on and after the Closing Date:

> Stonewall Insurance Company
> c/o Eastgate, Inc.
> P.O. Box 9510
> Boston, Massachusetts  02114-9510
> (street address:  7 Bullfinch Place)
> Attn:  Bryan Klinck
> Telecopy:  (617) 725-1599

Either party hereto may change the foregoing address or facsimile number on thirty (30) days notice to the other parties.  Notice shall be deemed effective:

1.  If communicated by telecopier at the time of transmission, and, for the purpose of proving such transmission it shall be sufficient to prove that the facsimile transmission was made to the number notified by the party in question for this purpose and that a transmission report was received from the machine from which the facsimile was sent which indicates that the facsimile was sent in its entirety to the facsimile number of the recipient.

**Page 12**

2.  If sent by certified mail at the expiration of ninety-six (96) hours after the envelope containing the same was delivered into the custody of the United States postal authorities, and shall be effective notwithstanding that it may be misdelivered or returned undelivered.

## ARTICLE 18. STANDARD OF CARE

In undertaking the obligations and responsibilities described herein, the Reinsured and Claims Servicer will have a fiduciary duty to act in utmost good faith to the interests of Reinsurer.

## ARTICLE 19. ENTIRE AGREEMENT

The parties hereto agree that this Reinsurance is not cancelable or voidable. This Reinsurance is the entire agreement between the Reinsured and the Reinsurer and shall not be subject to, or modified by, any prior representations or agreements, written or oral, except as otherwise expressly indicated herein.

## ARTICLE 20. REPORTS AND REMITTANCES

Reports. The Reinsured shall provide the Reinsurer with summary reports of quarterly and cumulative claims activity subject to this Reinsurance within 45 days of the close of each calendar quarter (the "Quarterly Reports"). The Reinsured shall further provide Reinsurer a monthly cash report identifying all receipts and disbursements subject to this Reinsurance and estimating receipts and disbursements for the following month. The Reinsured shall also provide such other documentation as the Reinsurer may reasonably request to assess its exposure under this Reinsurance.

Annual Statement. As promptly as possible following the end of each calendar year, the Reinsurer and Reinsured shall furnish each other with a copy of their (1) most recent annual statement filed with their domiciliary state insurance regulator; and (2) financial statements (statutory basis) as audited by certified public accountants and filed with its domiciliary state insurance regulator.

Claims Account. The Reinsurer shall establish and maintain an account for use by the Reinsured for the payment of claims hereunder (the "Claims Account"). The amount of funds to be maintained in the Claims Account shall be agreed between the Reinsured and the Reinsurer as may be necessary from time to time, in an amount sufficient to fund the payment of claims as they fall due from time to time, subject to the terms, conditions and aggregate limit of this Reinsurance. In addition, the Reinsured shall have the right to make reasonable requests of immediate additional funding from the Reinsurer to such Claims Account from time to time and the Reinsurer shall immediately honor, subject to Article 11 herein, such a request for immediate additional funding provided that the liability for claims paid are otherwise covered and immediately due under this Reinsurance. Interest on funds in the Claims Account shall be the property of the Reinsurer. Subject

to all other terms of this Agreement and following receipt of Premium, Reinsurer will settle its liabilities as due no less frequently than quarterly and payments will be made in cash.

## ARTICLE 21. RESERVES

For insurance regulatory accounting purposes, (1) the Reinsured shall determine the amount of its reserves on the Underlying Claims and may change those reserves from time to time as it, in its sole discretion, deems necessary or appropriate, and (2) the Reinsurer shall determine the amount of its reserves on its liability hereunder and may change those reserves from time to time as its, in its sole discretion, deems necessary or appropriate. Notwithstanding the foregoing, Reinsurer's reserves shall be no less than Reinsured's reserves on the Underlying Claims.

## ARTICLE 22. CREDIT FOR REINSURANCE

If at any time (other than pursuant to any change in domicile for which Reinsurer's consent has not been obtained under Article 10) the Reinsured is advised by an insurance regulatory authority in which it is licensed or is an accredited reinsurer that, during the term of this Reinsurance, it will not be able, due to the licensing status or the lack of appropriate accreditation (or other qualification similarly required by an applicable insurance regulatory authority in any jurisdiction within the United States of America to assume reinsurance obligations) of the Reinsurer, to take full credit for reinsurance recoverables hereunder (whether paid or unpaid) in its then current financial statements required by appropriate state insurance regulatory authorities in any jurisdiction within the United States, and the Reinsured gives the Reinsurer written notice to such effect, the Reinsurer will take all steps necessary to enable the Reinsured to receive full credit for such reinsurance recoverables in such then current financial statements, which may include any one or combination of the following: providing funds withheld, cash advances, a trust agreement, letter of credit, the delivery of collateral acceptable to the appropriate insurance regulatory authorities, amending this Reinsurance in form but not in substance or such other action acceptable to Reinsurer and applicable insurance regulatory authorities. The Reinsurer has sole discretion in which necessary steps to take, and the Reinsured will fully cooperate in implementing the steps so chosen, so long as the steps the Reinsurer chooses and takes enable the Reinsured to receive such full credit. Interest and all other investment income on any funds posted as security pursuant to Article 22 shall be sole property of Reinsurer.

## ARTICLE 23. TERRITORY

The Reinsurance shall apply to Insurance Policies/Reinsurance Contracts covering risks wherever situated.

## ARTICLE 24. INTERMEDIARY

**Page 14**

10/04/2000 17:42 FAX 212 909 6336    DEBEVOISE & PLIMPTON
MAY-05-2000 FRI 02:09 PM    FAX NO.

The parties hereto represent and warrant to each other that no intermediary was involved in the procurement of this Reinsurance.

## ARTICLE 25.  COUNTERPARTS

This Reinsurance may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

## ARTICLE 26.  DUE DILIGENCE

Reinsurer acknowledges that it has conducted its own due diligence review of Reinsured's business and operations and that it is relying on its own independent investigation in making its decision to enter into this Agreement. Reinsurer is not relying upon any representation or warranty made on or prior to the Effective Date by Reinsured or any of its affiliates, subsidiaries or parent which is not expressly set forth in this Agreement.

)/04/2000 17:42 FAX 212 909 6836    DEBEVOISE & PLIMPTON

2000 10:46 FAX 212 909 6963    DEBEVOISE & PLIMPTON
MAY-03-2000 WED 03:04 PM    FAX NO.    Ⓩ003/003
P. 18/26

## ARTICLE 27. HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at ___Cincinnati, OHIO___ on this ___9th day of ___May___, 2000.

STONEWALL INSURANCE COMPANY

By_____
  Gary J. Gruber
Title: Chairman & Vice President

and at _____ on this _____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY

By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED

By_____
Title:

DUKES PLACE HOLDINGS L.P., by its General Partner Dukes Place Holdings Ltd.

By_____
Title:

0/04/2000 17:42 FAX 212 909 6836    DEBEVOISE & PLIMPTON    P. 17
FAX NO.
MAY-05-2000 FRI 02:09 PM

## ARTICLE 27.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance,

Executed at _____, _____ on this _____ day of _____, 2000.

STONEWALL INSURANCE COMPANY


By_____

Title:


and at _Stmfd_, _Cmn.___ on this _5th_ day of _May_, 2000.

NATIONAL INDEMNITY COMPANY


By_____

Title: _VICE PRESIDENT_

Acknowledged and Accepted:

EASTGATE GROUP LIMITED

DUKES PLACE HOLDINGS L.P., by its General Partner Dukes Place Holdings Ltd.


By_____
Title:

By_____
Title:

)/04/2000 17:42 FAX 212 909 6836    DEBEVOISE & PLIMPTON

## ARTICLE 27.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this _____ day of _____, 2000.

STONEWALL INSURANCE COMPANY


By_____

Title:


and at _____, _____ on this _____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY


By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED

DUKES PLACE HOLDINGS L.P., by its General Partner Dukes Place Holdings Ltd.

By_____  _K. E. Randall_
Title:            _Chief Executive_

By_____
Title:

04/2000 17:42 FAX 212 909 6836    DEBEVOISE & PLIMPTON                   NO. 3591  P. 18/24
MAY. 5. 2000  4:04PM    GREENWICH ST. CAPITAL          FAX NO.
MAY-03-2000 WED 03:48 PM

## ARTICLE 27.  HEADINGS

The headings of the Articles and the paragraphs herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Reinsurance.

IN WITNESS WHEREOF, the parties have caused this Reinsurance to be executed by their duly authorized representatives and Eastgate Group Limited and Duke Place Holdings L.P. have caused their duly authorized representatives to affirm their respective acknowledgement and acceptance.

Executed at _____, _____ on this 5th day of May, 2000.

STONEWALL INSURANCE COMPANY


By_____

Title:


and at _____, _____ on this ____ day of _____, 2000.

NATIONAL INDEMNITY COMPANY


By_____
Title:

Acknowledged and Accepted:

EASTGATE GROUP LIMITED


DUKES PLACE HOLDINGS L.P., by
its General Partner Dukes Place
Holdings Ltd.

By_____
Title:

By_____
Title:

Page 17

## Amendment No. 1
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

### Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at Cincinnati, Ohio
on this 29 day of September, 2000.

STONEWALL INSURANCE
COMPANY

By: _K. Kelley Horrell_
Name: Karen Kelley Horrell
Title: Vice President

Executed at _____,_____
on this __ day of September, 2000.

NATIONAL INDEMNITY COMPANY

By: _____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By: _____
Name:
Title:

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General Partner

By: _____
Name:
Title:

4/2000 17:42 FAX 212 909 6836    DEBEVOISE & PLIMPTON    973 265 3332;    Sep. ·  0  6:22AM;
; Chitogenics, Inc.;

**Amendment No. 1**
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____,_____
on this __ day of September, 2000.

STONEWALL INSURANCE
COMPANY


By:_____
Name:
Title:

Executed at _____,_____
on this __ day of September, 2000.

NATIONAL INDEMNITY COMPANY


By:_____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited


By:_____
Name:
Title:

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General Partner


By:_____
Name:
Title:

21033638v1

**Amendment No. 1**
Stonewall Insurance Company
of Cincinnati, Ohio
Aggregate Reinsurance Agreement
No. RA 1385

This Agreement is hereby amended as follows:

**Article 11**

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer, provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____, _____    Acknowledged and Accepted:
on this ___ day of September, 2000.
                                         Eastgate Group Limited
STONEWALL INSURANCE
COMPANY
                                         By:_____
                                         Name:
                                         Title:

By:_____
Name:                                    Dukes Place Holdings, L.P.
Title:                                   By: Dukes Place Holdings Ltd, General
                                         Partner
Executed at Stanford, Connecticut
on this 28 day of September, 2000.

NATIONAL INDEMNITY COMPANY               By:_____
                                         Name:
                                         Title:
By: _____
Name: Brian Snover
Title: Vice President

## Amendment No. 1
### Stonewall Insurance Company
### of Cincinnati, Ohio
### Aggregate Reinsurance Agreement
### No. RA 1385

This Agreement is hereby amended as follows:

### Article 11

The second paragraph of Article 11(D) is replaced in its entirety with the following:

"In the event that (1) on or after the fifth anniversary of the Effective Date, Dukes Place Holdings L.P. sells 50% or more of the Voting Securities of Reinsured to any other person or persons; or (2) Reinsured becomes insolvent then Reinsurer shall, subject to any required regulatory approval, have the right to become the Claims Servicer until this Reinsurance is exhausted, and shall administer the claims under the same terms and conditions as the original Claims Servicer; provided that, if the Reinsurer becomes the Claims Servicer, the consideration payable by the Reinsured to the Reinsurer shall be the reimbursement by the Reinsured to the Reinsurer of all Unallocated Loss Adjustment Expense incurred by the Reinsurer as Claims Servicer."

All other terms and conditions remain unchanged. This Amendment No. 1 shall come into full force and effect on the Effective Date as set forth in the Agreement.

Executed at _____, _____
on this __ day of September, 2000.

**STONEWALL INSURANCE COMPANY**

By:_____
Name:
Title:

Executed at _____, _____
on this __ day of September, 2000.

**NATIONAL INDEMNITY COMPANY**

By:_____
Name:
Title:

Acknowledged and Accepted:

Eastgate Group Limited

By:_____
Name: KS RANDALL
Title: CHIEF EXECUTIVE OFFICER

Dukes Place Holdings, L.P.
By: Dukes Place Holdings Ltd, General Partner

By:_____
Name:
Title:

DATED  January 18, 2006

(1) STONEWALL INSURANCE COMPANY

(2) CASTLEWOOD (US) INC.

---

### AGREEMENT RELATING TO ADMINISTRATION OF RUN-OFF BUSINESS

---

**Confidential**
**ST-006908**

Date: January 18, 2006

Parties:

(1)    **STONEWALL INSURANCE COMPANY**, a property/casualty insurance company organized under the laws of the State of Rhode Island ("**the Company**"); and

(2)    **CASTLEWOOD (US) INC.**, a corporation organized under the laws of the State of Delaware ("**Castlewood**").

Recitals:

(A)    The Company is authorized by Regulatory Authorities to transact various classes of insurance and reinsurance business in accordance with applicable law and has ceased underwriting in respect of the Business (as defined below).

(B)    Castlewood carries on the business, inter alia, of administration in respect of insurance and reinsurance companies.

(C)    The Company now wishes to appoint Castlewood to provide certain administrative services in respect of the run-off of the Business.

**Operative Provisions:**

**1.    Interpretation**

1.1    In this Agreement, the following definitions shall have the following meanings:

| | |
|---|---|
| "**Accounting Period**" | means, unless otherwise stated, a calendar year; |
| "**Affiliate**" | means, with respect to any Person, a Person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person; |
| "**Agents**" | means those parties under the direct instruction of the Board providing services in connection with the Business; |
| "**Agreement**" | means this Agreement and the Schedules attached hereto; |
| "**Board**" | means the Board of Directors of the Company; |

2

**Confidential
ST-006909**

| | |
|---|---|
| "Business" | means the business of the Company at the Effective Date including, without limitation, the Run-Off Business and such other activities as may be required by law or otherwise to facilitate the proper conduct of the Run-Off Business; |
| "Business Day" | means a day on which banks generally are open in the City of New York for the transaction of normal banking business (other than a Saturday); |
| "Claims" | means those claims arising on the Run-Off Business; |
| "Claims Servicer" | means collectively, the staff of the Company employed to service the claims of the Company; |
| "Company Representative" | means the individual designated by the Company by means of written notice to Castlewood from time to time as being authorized to give instructions to Castlewood, the first such individual being named in Schedule 2; |
| "Data" | means all data of the Business belonging to the Company which is processed by or stored on the System; |
| "Effective Date" | means January 18, 2006; |
| "Force Majeure" | means circumstances beyond the reasonable control of a party; |
| "Regulatory Authorities" | means the insurance regulatory authorities having responsibility for the supervision of insurance business of the Company in the United States; |
| "Person" | includes an individual, firm, corporation, partnership, limited liability company, trust, association, unincorporated association or other entity or body of persons; |
| "Reinsurance Agreements" | means the Aggregate Reinsurance Agreement, dated as of May 5, 2000, between the Company and National Indemnity Company, as amended ("NIC"); |

38565248.4
SSL-DOCS2 70261956v3

1/18/2006

Confidential
ST-006910

| | |
|---|---|
| "Records" | means the books and records received or subsequently held by Castlewood in the performance of its obligations under this Agreement, including the Data; |
| "Run-Off Business" | means the run-off of Claims, rights and obligations under all insurance policies and reinsurance contracts underwritten or ceded by the Company; |
| "Services" | means the services provided by Castlewood specified in Schedule 1; |
| "System" | means the computer systems on which the Business is currently processed. |

1.2    Words denoting the singular number only include the plural and vice versa.

1.3    References to a statute or statutory provision include a reference to it as from time to time amended, extended or re-enacted, provided that such amendment or extension or re-enactment shall not increase the liability of a party to this Agreement.

1.4    Headings to clauses are for the purpose of general identification only and shall not be construed as forming part of this Agreement.

## 2.    Provision of Services

2.1    The Company appoints and authorizes Castlewood from the Effective Date to provide the Services in respect of the Business. Castlewood shall perform the Services with reasonable care and skill in a professional and efficient manner.

2.2    The Company appoints and authorizes Castlewood from the Effective Date to administer the Reinsurance Agreement. A complete and correct copy of the Reinsurance Agreement is attached hereto as Exhibit A. Castlewood warrants that it has read the Reinsurance Agreement in its entirety, that the Reinsurance Agreement creates various rights and obligations with respect to the Run-Off Business between the Company, on the one hand, and NIC, on the other. Castlewood agrees to administer the Reinsurance Agreement consistent with the Company's rights and obligations under the Reinsurance Agreement. The services provided herein shall specifically exclude those provided by the Claims Servicer.

2.3    Castlewood will assist the Company in complying with Article 9 (Access to Records) of the Reinsurance Agreement.

2.4    The Company shall act in good faith when dealing with Castlewood or its Affiliates and shall be responsible for the regular review and setting of its strategy.

4

Confidential
ST-006911

2.5   Both parties shall comply with all applicable laws, rules and regulations in respect of all activities conducted under this Agreement.

2.6   The Company shall have the ultimate and final authority over decisions and policies, including, but not limited to, the payment or non-payment of claims.

2.7   Notwithstanding any other provision of this Agreement, it is understood that the business and affairs of the Company shall be managed by and subject to the direction and control of the Board and, to the extent delegated by the Board, by the Company's appropriately designated officers.

### 3.   Records and System

3.1   The Company shall deliver or cause to be delivered to Castlewood all books and records constituting the Records, as well as any other relevant information.

3.2   The Company Representative and Regulatory Authorities shall at reasonable times and on reasonable written notice have access to and the right to examine the Records. Representatives of Castlewood shall be made available, subject to reasonable written notice, to assist the Company Representative and Regulatory Authorities in the examination of the Records.

3.3   Except as provided for in this Agreement, it is understood that the Records maintained by Castlewood shall remain the property of the Company.

3.4   Castlewood shall be responsible for the storage of Records delivered into its control. Castlewood will protect Data from unauthorized access and will take all reasonable steps to ensure that, once on the System, Data is kept free from any computer viruses, corruption or inaccuracies.

3.5   The Company will use its best efforts to promptly license or undertake to have licensed to Castlewood the systems currently employed by or on behalf of the Company in connection with the Business. The property rights to any such systems licensed to Castlewood by the Company shall remain vested in the Company. Any specific programming or systems developments carried out by or on behalf of Castlewood in providing the Services, whether or not connected with the System, shall be the property of the Company.

3.6   If the Company's best efforts per 3.5 are unsuccessful and Castlewood is required to utilize other software, then Castlewood shall use its best efforts to procure an alternative system on which to use such software.

### 4.   Duration

4.1   This Agreement shall commence on the Effective Date and shall continue thereafter unless terminated in accordance with clause 5.

5

**Confidential
ST-006912**

**5.    Termination**

5.1    Subject to clause 5.2, this Agreement may be terminated by at least 3 months prior written notice given by either party.

5.2    This Agreement may be terminated immediately by notice served on the other party if the other party shall at any time:

    5.2.1    commit a material breach of any of the material provisions of this Agreement and, in the case of any such material breach capable of remedy, fail to remedy such breach within thirty days after receipt of a notice giving reasonable particulars of the breach and requiring it to be remedied;

    5.2.2    be adjudged insolvent by a court of competent jurisdiction;

    5.2.3    enter into bankruptcy, liquidation or rehabilitation (whether voluntarily or otherwise) or have a receiver, liquidator and rehabilitator appointed; or

    5.2.4    shall have willfully committed a material act of fraud in performing its obligations hereunder.

5.3    During any period of notice:

    5.3.1    the Company shall continue to perform its obligations in accordance with the terms of this Agreement; and

    5.3.2    Castlewood shall continue to perform its obligations in accordance with the terms of this Agreement but only in so far as they are capable of completion on or before the termination date.

5.4    Termination in accordance with the above provisions, or howsoever effected, shall take effect without prejudice to the rights and obligations of the parties which have accrued at the date of termination or which may subsequently accrue.

**6.    Post-termination**

6.1    Upon proper termination of this Agreement and subject to a right of set off in respect of money owed or capable of being owed to Castlewood under this Agreement, all sums held by Castlewood on behalf of the Company pursuant to clause 7 of Schedule 1 shall be returned to the Company or its designee on receipt of a written instruction from the Company Representative.

3558248.4
SSL-DOCS2 70261956v3

1/18/2006

**Confidential
ST-006913**

6.2     Within thirty days of the termination of this Agreement, the Company Representative shall be entitled to require Castlewood to carry out one or more of the following in an orderly fashion:

6.2.1     deliver to the Company all the Records relating to the Business including any off-line storage and security copies of the Data;

6.2.2     store on magnetic, optical or other media all or any of the information then stored on-line relating the Business and to deliver such media to the Company;

6.2.3     make and deliver to the Company such printouts of information relating to the Business as the Company may reasonably require,

provided that no outstanding sums are due to Castlewood and that all reasonable costs incurred by Castlewood in complying with these obligations are reimbursed by the Company to Castlewood in full upon demand.

6.3     Any work incurred by Castlewood at the request of the Company after the termination date, regardless of the reason for the termination, shall be reimbursed by the Company in accordance with clause 2 of Schedule 3.

6.4     Any work performed by Castlewood after the termination date shall not constitute the waiver of any rights or remedies which have accrued or may accrue in favor of Castlewood in consequence of a breach of any of the provisions of this Agreement or to which Castlewood is entitled at law or howsoever arising, nor shall it defeat the prior termination of this Agreement by either party.

6.5     For the avoidance of doubt, the provisions of this Section 6 and Sections and clauses 3.2, 7, 10, 11, 15.6 and 15.7 shall survive the termination of this Agreement and continue in full force and effect.

7.     **Confidentiality and non-solicitation**

7.1     Confidentiality.  Each of the Company and Castlewood shall keep confidential and not use or disclose any information previously or hereafter obtained by it pursuant to this Agreement (the party receiving such information is hereinafter referred to as the "Receiving Party") with respect to the other or such other's parents, subsidiaries, Affiliates or other related entities (the party, or such party's parents, subsidiaries, Affiliates or other related entities, with respect to which the information relates is hereinafter referred to as the "Disclosing Party") in connection with this Agreement and the negotiations preceding this Agreement (such information is hereinafter referred to as the "Confidential Information"), and the Receiving Party will use such Confidential Information solely in connection with the transactions contemplated by this Agreement, and if the transactions contemplated hereby are not consummated for any reason, the Receiving Party shall either return to the Disclosing Party, without retaining a copy thereof, or destroy, any schedules, documents or other written or electronically stored information constituting Confidential Information (or prepared based upon such Confidential Information) in

7

**Confidential
ST-006914**

connection with this Agreement and the transactions contemplated hereby and the negotiations preceding this Agreement. Without limiting the generality of the foregoing, the Receiving Party shall be permitted to disclose any Confidential Information to such of its Affiliates, officers, directors, employees, agents, lenders and representatives (collectively, "Representatives") as have a need to know such Confidential Information, provided such Representatives shall be informed that disclosure of such Confidential Information by such Representatives would be in contravention hereof and the Receiving Party shall be responsible for any disclosure prohibited hereby by any of its Representatives. Notwithstanding the foregoing, the Receiving Party shall not be required to keep confidential or return any information which (i) is known or available through other lawful sources, not bound by a confidentiality agreement with the Disclosing Party, or (ii) is or becomes publicly known other than as a result of the disclosure by the Receiving Party or its Representatives, or (iii) is required to be disclosed pursuant to an order or request of a judicial or governmental authority, an arbitrator or arbitration panel or a self-regulatory body or pursuant to any law or regulation in any jurisdiction (provided that the Disclosing Party, to the extent permitted by law, is given reasonable prior written notice), or (iv) is developed by the Receiving Party independently of, and is not based upon, the Confidential Information.

7.2    For the avoidance of doubt, all methodologies, strategic and business plans drawn up by Castlewood for and in the performance of this Agreement shall remain the sole property of Castlewood and nothing shall be construed as granting the Company a license to use such information in any form after the termination of this Agreement without the consent of Castlewood.

7.3    Castlewood shall be authorized to refer to the Company as a client in its marketing literature.

7.4    Subject to the following proviso, both during and for a period of twelve months after any termination of this Agreement, the Company shall not solicit in any way the employment of, or induce (or assist any other Person to so solicit or induce) any officer or employee of Castlewood to cease to be such an officer or employee, it being understood that this clause 7.4 shall not apply in the event of any termination of this Agreement pursuant to Section 5.1 or by the Company pursuant to Section 5.2.

## 8.    Assignment and delegation

8.1    Neither party shall assign or deal in any similar manner with any of their rights or obligations under this Agreement without the prior written consent of the other, such consent not to be unreasonably withheld or delayed, provided that, subject to clause 10.2, Castlewood shall have the authority to delegate to any person such functions as it deems necessary for the performance of its obligations under this Agreement.

3556248.4
SSL-DOCS2 70261956v3

1/18/2006

**Confidential
ST-006915**

9.    **Remuneration of Castlewood**

9.1   In consideration for providing the Services, Castlewood shall be remunerated by the Company in accordance with the terms set out in Schedule 3.

10.    **Indemnification and Limitation of Liability**

10.1   The Company shall indemnify Castlewood against any liability which Castlewood may reasonably incur as a result of performing its obligations under this Agreement; provided, however, that such indemnity shall not apply to any liability to the extent such liability has been finally adjudicated by a court of competent jurisdiction to have resulted from the willful misconduct of Castlewood (including any consultants, independent contractors or other third parties engaged by it) or material breach of this Agreement by Castlewood.

10.2   Castlewood shall indemnify the Company against any liability which the Company may reasonably incur to the extent such liability has been finally adjudicated by a court of competent jurisdiction to have resulted from: (i) any material breach of this Agreement by Castlewood, (ii) any willful misconduct by Castlewood in the performance of its obligations under this Agreement, and (iii) any material breach of this Agreement by willful misconduct attributable to any consultants, independent contractors or any third party engaged by Castlewood as permitted by Section 8 hereof.

10.3   Castlewood shall at all times maintain errors and omissions insurance for its actions hereunder with such third-party insurers and in such amounts (including as to deductibles and caps) as are approved from time to time by the Company (such approval not to be unreasonably withheld).

10.4   In the case of any claim asserted by a third party against a party entitled to indemnification under this Agreement (the "Indemnified Party"), notice shall be given by the Indemnified Party to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and the Indemnified Party shall permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom, provided that (i) the counsel for the Indemnifying Party who shall conduct the defense of such claim or litigation shall be reasonably satisfactory to the Indemnified Party, (ii) the Indemnified Party may participate in such defense at such Indemnified Party's expense, and (iii) the failure by any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that such omission results in a failure of actual notice to the Indemnifying Party and such Indemnifying Party is materially damaged as a result of such failure to give notice. Except with the prior written consent of the Indemnified Party, no Indemnifying Party in the defense of any such claim or litigation shall consent to entry of any judgment or order, interim or otherwise, or enter into any settlement that provides for injunctive or other nonmonetary relief affecting the Indemnified Party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability with respect to such claim or

9

Confidential
ST-006916

litigation. In the event that the Indemnifying Party does not accept the defense of any matter as above provided, the Indemnified Party shall have the full right to defend against any such claim (at the expense of such Indemnifying Party) or demand and shall be entitled to settle or agree to pay in full such claim or demand. Notwithstanding the foregoing, the Indemnifying Party shall still provide indemnification to the Indemnified Party as provided in clause 10.1 and 10.2 of this Article 10. In any event, the Indemnifying Party and the Indemnified Party shall cooperate in the defense of any claim or litigation subject to this Article 10 and the records of each shall be available to the other with respect to such defense.

10.5    Neither party shall be liable to the other party for loss of profits or revenue, loss of goodwill, loss of anticipated savings or for any type of special, indirect or consequential loss even if such loss was reasonably foreseeable or the breaching party had been advised of the possibility of the non-breaching party incurring the same.

10.6    Castlewood's entire liability to the Company or its Affiliates in respect of any breach of this Agreement or any act or omission in connection with this Agreement shall be limited to damages of an amount not exceeding the fees paid to Castlewood during the previous 12 calendar months.

10.7    If a number of breaches of this Agreement and/or omissions give rise to substantially the same loss, then they shall be regarded as giving rise to only one claim under this Agreement and such claim shall be limited to damages of an amount not exceeding the fees paid to Castlewood during the previous 12 calendar months.

10.8    If a number of breaches of this Agreement and/or omissions give rise to claims for damages then the damages payable by Castlewood in respect of those claims shall not in aggregate exceed the fees paid to Castlewood during the previous 12 calendar months.

10.9    Castlewood shall at all times maintain a fidelity bond or fidelity insurance coverage inuring to the benefit of the Company with a penal sum or limit of liability, as the case may be, of at least $1,000,000.

## 11.    Force Majeure

11.1    If a party's performance obligations under this Agreement are affected by Force Majeure, it shall immediately notify the other party.

11.2    A party shall not be in breach of this Agreement by reason of the failure or delay in performance of any obligations to the extent that such failure or delay is caused by Force Majeure, and the time for performance shall be extended accordingly.

11.3    If a party's performance obligations are affected by Force Majeure for a continuous period in excess of thirty days, the parties shall enter into bona fide discussions with a view to alleviating the situation or to agreeing upon such alternative arrangements as may be fair and reasonable. If

3556248.4
SSL-DOCS2 70261956v3

1/18/2006

Confidential
ST-006917

the parties fail to agree upon a course of action within a further period of thirty days, then either may immediately terminate this Agreement by serving notice on the other.

**12.    Instructions**

12.1    The Company undertakes to respond promptly to all requests for instructions from Castlewood.

12.2    Any written instructions given to Castlewood by the Company Representative shall be deemed to be instructions of the Company. Furthermore, any matter referred to the Company Representative shall be deemed properly communicated to the Company.

**13.    Notices**

13.1    Notices, statements and other communications under this Agreement shall be in writing and shall be served at the addresses listed below (or to such address as is notified in writing by one party to the other from time to time) by hand, facsimile, recorded delivery or by first class post:

| | |
|---|---|
| Company: | Stonewall Insurance Company |
| | c/o GSC Partners Europe Ltd. |
| | 68 Pall Mall, First Floor |
| | London, SW1 Y5ES |
| | United Kingdom |
| | |
| Attention: | Mayur Patel |
| Facsimile: | (+44) 207 968 3636 |

With a copy to the Company Representative.

| | |
|---|---|
| Castlewood: | Castlewood (US) Inc. |
| | 7901 4th Street N. Suite 203 |
| | St. Petersburg, FL 33702 |
| | |
| Attention: | Karl Wall |
| Facsimile: | (727) 576-3627 |

13.2    Notices shall be deemed served:

13.2.1  when delivered by hand, at the time of delivery;

13.2.2  when sent by facsimile, at the time of a fully complete transmission, as documented by receipt of confirmation generated by the sender's or recipient's facsimile equipment; *provided* that a facsimile sent outside normal business hours

11

**Confidential**
**ST-006918**

on a business day at the place of receipt will be deemed sent at the opening of normal business hours on the next business day;

13.2.3 when sent by recorded delivery or first class post, at the expiration of 48 hours from despatch.

### 14.    Further assurance and good faith

14.1    Each party agrees from time to time to do all such acts and to execute and deliver all such instruments as may be required or reasonably requested by the other party to establish, maintain and protect the rights and remedies of the other party and to carry out and effect the intent and purpose of this Agreement. Each of the parties agrees with the other that it will at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith.

### 15.    General

15.1    This Agreement sets out the entire understanding of the parties with respect to the matters with which it deals and may be amended or modified only by written instrument duly executed by each party.

15.2    Each party acknowledges that it has not relied upon or been induced to enter into this Agreement by any representation other than a representation expressly set out in this Agreement and neither party shall be liable to the other in equity, contract, tort or in any other way for any representation not expressly set out in this Agreement.

15.3    If any provision of this Agreement shall in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that provision or part shall to that extent be deemed not to form a part of this Agreement and the enforceability of the remainder of this Agreement shall not be affected.

15.4    The rights which each party has under this Agreement shall not be prejudiced or restricted by any indulgence or forbearance extended to the other party. No waiver by any party in respect of a breach shall operate as a waiver in respect of any other or subsequent breach.

15.5    This Agreement may be executed in counterparts all of which together shall constitute one and the same instrument and all counterparts shall be deemed to be originals.

15.6    This Agreement shall be governed by and construed in accordance with New York law without reference to that State's law concerning conflicts of law.

15.7    In the event that any differences arising between the Company and Castlewood under this Agreement, such differences shall be submitted to arbitration. The Company and

12

3555248.4
SSL-DOCS2 702£1956v3

1/18/2006

Confidential
ST-006919

Castlewood shall each nominate an arbiter, and the arbiters shall then choose an umpire before they enter upon arbitration. In the event that either party fails to name its arbiter within thirty (30) days of the other party requesting it to do so, the latter shall name both arbiters, and both arbiters shall choose the umpire before entering upon arbitration. If the two arbitrators are unable to agree upon an umpire, the American Arbitration Association shall choose the umpire at the request of either party, but nothing herein shall be considered an election by the parties that the arbitration proceed in accordance with the rules or procedures of the American Arbitration Association, other than the rules and procedures applicable to appointment of the umpire. The arbiters shall then consider the differences, and failing to agree, shall submit only such questions upon which they disagree to the umpire. The arbiters and the umpire shall be active or retired disinterested executive officers of insurance or reinsurance companies authorized to transact business in the United States. The arbiters and the umpire are relieved from all judicial formalities and may abstain from following the strict rules of law. A decision of the majority in writing when filed with the Company and Castlewood, shall be final and binding upon both. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets. Any arbitration shall take place in New York, New York. Each party shall bear the expense of its own arbiter, or one-half the expense of the two arbitrators if both are appointed by the requesting party as provided above, and shall jointly and equally bear the expense with the other the expense of the umpire.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

3556248.4
SSL-DOCS2 7026195693

1/18/2006

Confidential
ST-006920

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

STONEWALL INSURANCE COMPANY

By: _____
Name:   R. L. BARCLAY
Title:   PRESIDENT


CASTLEWOOD (US) INC.

By: _____
Name:   KARL J. WALL
Title:   PRESIDENT & COO

355624B.4
SSL-DOCS2 70261956v3

1/18/2006

Confidential
ST-006921

**SCHEDULE 1**

**The Services**

Subject always to the Company Representative's direction, Castlewood shall be authorized to carry out the Services set out below.

1.     Processing and accounting services

1.1    Processing of premiums.

1.2    Maintenance of Company ledgers.

1.3    Payment of balances and the recovery of amounts due from insureds, reinsurers, reinsured, brokers and other intermediaries.

1.4    Maintenance of a reinsurance credit control system.

2.     **Management services**

2.1    Advising the Company on overall strategy.

2.2    Maintaining and giving instructions pursuant to the banking resolutions provided by the Company from time to time on bank accounts in the name of the Company at such banks as the Company may from time to time designate (all funds received and disbursed by Castlewood in carrying out the Business of the Company shall be deposited in or drawn from, as the case may be, such accounts).

2.3    Submitting to Regulatory Authorities all relevant returns (including but not limited to statutory unaudited annual and quarterly statements and audited statutory annual statements) received in respect of the Company and dealing with any inquiries which arise.

2.4    Advising the Company as soon as any legislative or regulatory proceedings or complaints or any other material matters relating to the Company come to the attention of Castlewood.

2.5    Provision of facility for meetings of the Board or shareholders of the Company.

2.6    Provision of information required by the Company's tax advisors for preparation of the Company's corporation tax returns.

2.7    Monitoring the Company's solvency.

15

**Confidential
ST-006922**

3.     **Claims handling services**

If requested, Castlewood may assist the Claims Servicer under the Company's direction, in such manner as the Company may from time to time request in the following areas:

- participation in any scheme or arrangement designed to mitigate or avert Claims or increase salvage;

- exercise of rights of subrogation against third parties in the name of the Company;

- carrying out the review, handling and adjusting of Claims;

- carrying out any ancillary Claims processing work relating to the Run-Off Business;

- liaise with professional advisers in respect of disputed Claims in terms of providing information, initial instructions;

- reviewing the Company's outstanding Claims reserves and report the findings; and

- reviewing and comment on the IBNR proposed by the Company's actuaries.

4.     **Limitation of Authority**

4.1    For the completion of contracts of insurance and reinsurance, Castlewood shall not:

- enter into any new contract;
- extend the periods of cover under existing contracts; or
- increase the limits of liability under existing contracts,

without the prior written approval of the Company Representative.

5.     **Commutations**

5.1    Identifying targets for commutation according to, inter alia, the following criteria:

- nature of cedent/assured;
- risk profile;
- reserve levels; and
- deterioration forecasts.

5.2    Presenting a schedule of targets and a commutations status report at each Board meeting.

3566248.4
SSL-DOCS2 7C261956v3

1/18/2006

**Confidential
ST-006923**

5.3    Negotiation and drafting of commutation agreements to the extent permitted under the Reinsurance Agreements.

6.    **Reports to the Company**

6.1    Provision of statements, reports and accounts relating to the Business as follows:

| | Frequency | Service Level (Business Days after period ended) |
|---|---|---|
| Claims received, agreed, rejected | Monthly | 45 |
| Commutations progress | Quarterly | 45 |
| Problematic reinsurance collections | Monthly | 45 |
| Reinsurance recoveries submitted | Quarterly | 45 |
| Credit notes received | Quarterly | 45 |
| Cash received from reinsurers | Monthly | 45 |
| Cashflow statement | Quarterly | 45 |
| Management accounts | Quarterly | 45 |
| Claims exception report | Monthly | 45 |
| Details of new claims | Monthly | 45 |
| Analysis of LMX reinsurance cover | Quarterly | 45 |
| Underwriting Development Statistics | Quarterly | 45 |
| Asbestosis and Environmental Pollution Analyses | Quarterly | 60 |
| Shareholder Report | Annually | 60 |
| IBNR recommendation | Annually | 60 |
| Unaudited and audited statutory annual statements | Annually | as required by law |
| Unaudited statutory quarterly statements | Quarterly | as required by law |

6.2    Castlewood shall also provide, on behalf of the Company, such statements, reports and accounts relating to the Business to National Indemnity Company ("NIC") as and when the same are required to be delivered to NIC by the Company pursuant to the terms of the Reinsurance Agreements.

6.3    The service levels are calculated on the following assumptions:

•    that each monthly period will be closed on the last Friday of each calendar month; and

•    that all Data is stored on the System.

17

1/18/2006

**Confidential
ST-006924**

### 7.    Treasury and cash management functions

7.1    Liaison with bankers to ensure smooth running of accounts.

7.2    Carrying out monthly bank reconciliations.

7.3    Investment of Company funds on short term deposit (as directed by the Company).

7.4    All bank or other funds of Company shall be maintained in a segregated account and not be commingled with funds of Castlewood or its other clients.

7.5    The Company Representative shall be authorized to access Company fund accounts.

7.6    Castlewood shall provide copies of all bank statements related to Company fund accounts.

### 8.    Corporate functions

8.1    Liaison with the Regulatory Authorities on the Company's behalf in connection with the Business.

8.2    Full company secretarial services, including the designation of a Company Secretary to be an officer of the Company, subject to approval by the Board.

3556248.4
SSL-DOCS2 78261956v3

1/18/2006

Confidential
ST-006925

## SCHEDULE 2

### The Company Representative

The Company Representative shall be _____ or such other individual as may be advised to Castlewood by the Company from time to time in writing.

355E248.4
SSL-DOCS2 70261956v3

1/18/2006

**Confidential
ST-006926**

**SCHEDULE 3**

**Remuneration of Castlewood**

1.    Annual fee

1.1    In consideration for providing the Services under this Agreement, and subject to the terms of this Schedule, the Company shall pay to Castlewood the fees as follows: (all amounts are in U.S. Dollars):

| | |
|---|---|
| January 18, 2006 – December 31, 2006 | $1,825,000 (payable in equal quarterly payments on January 27, April 1, July 1 and October 1) |
| January 1, 2007 – December 31, 2007 | $1,865,000 (payable in equal quarterly payments on January 1, April 1, July 1 and October 1) |
| January 1, 2008 – December 31, 2008 | $1,810,000 (payable in equal quarterly payments on January 1, April 1, July 1 and October 1) |

An adjustment will be made for reasonable Claims Servicer costs paid by the Company provided they have been agreed to by Castlewood in advance and further provided that the total of the costs paid by the Company to employ the Claims Servicer and the fees paid to Castlewood in respect of each year shall not exceed the amounts defined above for each such year.

1.2    In the event that there is a substantial change in the nature of the Business or the quantity of the Services provided by Castlewood, then each party will at the request of the other party seek in good faith to renegotiate the annual fee.

1.3    For periods subsequent to January 1, 2009, the annual fee shall be mutually agreed to by Castlewood and the Company.

2.    **Work outside the scope of the Agreement**

2.1    If Castlewood carries out any work not covered by the Services, then the Company shall reimburse Castlewood for such work on a time and materials basis at its current rates (which shall be subject to variation from time to time). Castlewood shall be entitled to invoice the Company on a monthly basis and the Company agrees to pay such invoices within fifteen days of receiving each invoice.

2.2    Any such additional work shall be carried out on the terms set out in this Agreement, including for the avoidance of doubt clause 10.

20

**Confidential**
**ST-006927**

2.3    Subject to the prior approval of the Company, Castlewood shall be reimbursed for its out-of-pocket expenses incurred in connection with the transition from the prior administrator to Castlewood.

**3.    Third party costs**

3.1    Fees include the staff and related costs of Castlewood in providing the Services.  For the avoidance of doubt, Castlewood's fees do not include third party costs and expenses which will be met directly by the Company including but not limited to:

3.1.1    subscriptions and directors' fees;

3.1.2    legal, actuarial, audit and other third party professional fees;

3.1.3    loss adjustment and claims-related expenses paid to third parties;

3.1.4    overseas travel undertaken at the request of (or with the prior approval of) the Company Representative;

3.1.5    the costs of travel, subsistence and accommodation incurred by Castlewood personnel having to conduct work at the request of (or with the prior approval of) the Company Representative, away from their normal office locations.

3.1.6    the cost of the Company's triennial reviews.

**4.    VAT**

4.1    Fees and rates referred to in the Agreement do not include any VAT, sales tax or other tax which, if applicable, shall be payable by the Company and added to such fees at the rate in force at the time they become due.

**5.    Conditions of payment**

5.1    The fees pursuant to Section 1.1 of this Schedule 3 are payable in advance, provided that if this Agreement is terminated for any reason prior to the end of the then current month or quarterly period, as applicable, with respect to which such period any such payment has previously been made, Castlewood shall, promptly following such termination, refund a pro-rata portion of such fee to the Company (based on the number of days elapsed/not-elapsed as of the effective date of such termination).

21

**Confidential
ST-006928**

5.2    All fees payable to Castlewood under this Agreement shall be paid in U.S. dollars and are deemed to accrue from day to day.

5.3    Time for payment is of the essence.

5.4    All such fees shall be payable at the address of Castlewood given for the purposes of notices under this Agreement or at such address as may be notified in writing by Castlewood to the Company from time to time.

3555248.4
SSL-DOCS2 70261956v3

1/18/2006

Confidential
ST-006929

DATED  January 18, 2006

(1) SEATON INSURANCE COMPANY

(2) CASTLEWOOD (US) INC.

---

AGREEMENT RELATING TO ADMINISTRATION
OF RUN-OFF BUSINESS

---

SSL-DOCS2 70261952v3

Confidential
ST-006886

Date:   January 18, 2006

Parties:

(1)     **SEATON INSURANCE COMPANY**, a property/casualty insurance company organized under the laws of the State of Rhode Island ("**the Company**"); and

(2)     **CASTLEWOOD (US) INC.**, a corporation organized under the laws of the State of Delaware ("**Castlewood**").

Recitals:

(A)     The Company is authorized by Regulatory Authorities to transact various classes of insurance and reinsurance business in accordance with applicable law and has ceased underwriting in respect of the Business (as defined below).

(B)     Castlewood carries on the business, inter alia, of administration in respect of insurance and reinsurance companies.

(C)     The Company now wishes to appoint Castlewood to provide certain administrative services in respect of the run-off of the Business.

**Operative Provisions:**

1.      **Interpretation**

1.1     In this Agreement, the following definitions shall have the following meanings:

| | |
|---|---|
| "**Accounting Period**" | means, unless otherwise stated, a calendar year; |
| "**Affiliate**" | means, with respect to any Person, a Person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person; |
| "**Agents**" | means those parties under the direct instruction of the Board providing services in connection with the Business; |
| "**Agreement**" | means this Agreement and the Schedules attached hereto; |
| "**Board**" | means the board of directors of the Company; |

2

1/18/2006

**Confidential
ST-006887**

| | |
|---|---|
| "Business" | means the business of the Company at the Effective Date including, without limitation, the Run-Off Business and such other activities as may be required by law or otherwise to facilitate the proper conduct of the Run-Off Business; |
| "Business Day" | means a day on which banks generally are open in the City of New York for the transaction of normal banking business (other than a Saturday); |
| "Claims" | means those claims arising on the Run-Off Business; |
| "Claims Servicer" | means collectively, the staff of the Company employed to service the claims of the Company; |
| "Company Representative" | means the individual notified in writing by the Company to Castlewood from time to time as being authorized to give instructions to Castlewood, the first such individual being named in Schedule 2; |
| "Data" | means all data of the Business belonging to the Company which is processed by or stored on the System; |
| "Effective Date" | means January 18, 2006; |
| "Force Majeure" | means circumstances beyond the reasonable control of a party; |
| "Regulatory Authorities" | means the insurance regulatory authorities having responsibility for the supervision of insurance business of the Company in the United States and Canada; |
| "Person" | includes an individual, firm, corporation, partnership, limited liability company, trust, association, unincorporated association or other body of persons; |
| "Reinsurance Agreements" | means (i) the Aggregate Retrocession of Loss Portfolio Agreement No. RA - 1321, between the Company and National Indemnity Company, and (ii) the First Aggregate Excess Retrocession of Loss Portfolio Agreement No. RA - 1322, between the Company and National Indemnity Company. |

3

Confidential
ST-006888

| | |
|---|---|
| "Records" | means the books and records received or subsequently held by Castlewood in the performance of its obligations under this Agreement, including the Data; |
| "Run-Off Business" | means the run-off of Claims, rights and obligations under all insurance policies and reinsurance contracts underwritten or ceded by the Company, except for all such policies and contracts which the Company has ceded to Unigard Insurance Company pursuant to the Quota Share Reinsurance Agreement, dated December 10, 1993, effective as of July 1, 1993, between the Company and both Unigard Insurance Company and Unigard Indemnity Company; |
| "Services" | means the services provided by Castlewood specified in Schedule 1; |
| "System" | means the computer systems on which the Business/Run-Off Business is currently processed. |

1.2    Words denoting the singular number only include the plural and vice versa.

1.3    References to a statute or statutory provision include a reference to it as from time to time amended, extended or re-enacted, provided that such amendment or extension or re-enactment shall not increase the liability of a party to this Agreement.

1.4    Headings to clauses are for the purpose of general identification only and shall not be construed as forming part of this Agreement.

## 2.    Provision of Services

2.1    The Company appoints and authorizes Castlewood from the Effective Date to provide the Services in respect of the Business.  Castlewood shall perform the Services with reasonable care and skill in a professional and efficient manner.

2.2    The Company warrants that it has full power under the Reinsurance Agreements, or will obtain such power, to delegate to Castlewood the run-off obligations.  Complete and correct copies of each Reinsurance Agreement are attached hereto as Exhibits A and B, respectively.  Castlewood warrants that it has read the Reinsurance Agreements in their entirety, that the Reinsurance Agreements create various rights and obligations with respect to the Run-Off Business between the Company, on the one hand, and National Indemnity Company ("NIC"), on the other, and that Castlewood will at all times cause the services to be performed in a manner consistent with the Company's rights and obligations under the Reinsurance Agreements.  The services provided herein shall specifically exclude those provided by the Claims Servicer.

4

Confidential
ST-006889

2.3   The Company shall act in good faith when dealing with Castlewood or its Affiliates and shall be responsible for the regular review and setting of its strategy.

2.4   Both parties shall comply with all applicable laws, rules and regulations in respect of all activities conducted under this Agreement.

2.5   The Company shall have the ultimate and final authority over decisions and policies, including, but not limited to, the payment or non-payment of claims.

2.6   Notwithstanding any other provision of this Agreement, it is understood that the business and affairs of the Company shall be managed by and subject to the direction and control of the Board and, to the extent delegated by the Board, by the Company's appropriately designated officers.

### 3.   Records and System

3.1   Subject to applicable law and regulations the Company shall deliver or cause to be delivered to Castlewood all books and records, either in original or copy format, constituting the Records, as well as any other relevant information.

3.2   The Company Representative and Regulatory Authorities shall at reasonable times and on reasonable written notice have access to and the right to examine the Records. Representatives of Castlewood shall be made available, subject to reasonable written notice, to assist the Company Representative and Regulatory Authorities in the examination of the Records.

3.3   Except as provided for in this Agreement, it is understood that the Records maintained by Castlewood shall remain the property of the Company.

3.4   Castlewood shall be responsible for the storage of Records delivered into its control. Castlewood will protect Data from unauthorized access and will take all reasonable steps to ensure that, once on the System, Data is kept free from any computer viruses, corruption or inaccuracies.

3.5   The Company will use its best efforts to promptly license or undertake to have licensed to Castlewood the systems currently employed by or on behalf of the Company in connection with the Business. To the extent the Company has any rights with respect to such property, the property rights to any such systems licensed to Castlewood by the Company shall remain vested in the Company. Any specific programming or systems developments carried out by or on behalf of Castlewood in providing the Services, whether or not connected with the System, shall be the property of the Company.

3.6   If the Company's best efforts per 3.5 are unsuccessful and Castlewood is required to utilize other software, then Castlewood shall use its best efforts to procure an alternative system on which to use such software.

5

**Confidential
ST-006890**

### 4.     Duration

4.1     This Agreement shall commence on the Effective Date and shall continue thereafter unless terminated in accordance with clause 5.

### 5.     Termination

5.1     Subject to clause 5.2, this Agreement may be terminated by at least 3 months prior written notice given by either party.

5.2     This Agreement may be terminated immediately by notice served on the other party if the other party shall at any time:

    5.2.1     commit a material breach of any of the material provisions of this Agreement and, in the case of any such material breach capable of remedy, fail to remedy this within thirty days after receipt of a notice giving reasonable particulars of the breach and requiring it to be remedied;

    5.2.2     be adjudged insolvent by a court of competent jurisdiction;

    5.2.3     enter into bankruptcy, liquidation or rehabilitation (whether voluntarily or otherwise) or have a receiver, liquidator and rehabilitator appointed; or

    5.2.4     shall have willfully committed a material act of fraud in performing its obligations hereunder.

5.3     During any period of notice:

    5.3.1     the Company shall continue to perform its obligations in accordance with the terms of this Agreement; and

    5.3.2     Castlewood shall continue to perform its obligations in accordance with the terms of this Agreement but only in so far as they are capable of completion on or before the termination date.

5.4     Termination in accordance with the above provisions, or howsoever effected, shall take effect without prejudice to the rights and obligations of the parties which have accrued at the date of termination or which may subsequently accrue.

3556167.4
SSL-DOCS2 7026195v3

Confidential
ST-006891

6.    **Post-termination**

6.1    Upon proper termination of this Agreement and subject to a right of set off in respect of money owed or capable of being owed to Castlewood under this Agreement, all sums held by Castlewood on behalf of the Company pursuant to paragraph 7 of Schedule 1 shall be returned to the Company or its designee on receipt of a written instruction from the Company Representative.

6.2    Within thirty days of the termination of this Agreement, the Company Representative shall be entitled to require Castlewood to carry out one or more of the following in an orderly fashion:

6.2.1    deliver to the Company all the Records relating to the Business including any off-line storage and security copies of the Data;

6.2.2    store on magnetic, optical or other media all or any of the information then stored on-line relating the Business and to deliver such media to the Company;

6.2.3    make and deliver to the Company such printouts of information relating to the Business as the Company may reasonably require,

provided that no outstanding sums are due to Castlewood and that all reasonable costs incurred by Castlewood in complying with these obligations are reimbursed by the Company to Castlewood in full upon demand.

6.3    Any work incurred by Castlewood at the request of the Company after the termination date, regardless of the reason for the termination, shall be reimbursed by the Company in accordance with paragraph 2 of Schedule 3.

6.4    Any work performed by Castlewood after the termination date shall not constitute the waiver of any rights or remedies which have accrued or may accrue in favor of Castlewood in consequence of a breach of any of the provisions of this Agreement or to which Castlewood is entitled at law or howsoever arising, nor shall it defeat the prior termination of this Agreement by either party.

6.5    For the avoidance of doubt, the provisions of this clause 6 and clauses 3.2, 7, 10, 11, 15.6 and 15.7 shall survive the termination of this Agreement and continue in full force and effect.

7.    **Confidentiality and non-solicitation**

7.1    <u>Confidentiality.</u>  Each of the Company and Castlewood shall keep confidential and not use or disclose any information previously or hereafter obtained by it pursuant to this Agreement (the party receiving such information is hereinafter referred to as the "Receiving Party") with respect to the other or such other's parents, subsidiaries, Affiliates or other related entities (the party, or such party's parents, subsidiaries, Affiliates or other related entities, with respect to which the information relates is hereinafter referred to as the "Disclosing Party") in connection with this

7

**Confidential
ST-006892**

Agreement and the negotiations preceding this Agreement (such information is hereinafter referred to as the "Confidential Information"), and the Receiving Party will use such Confidential Information solely in connection with the transactions contemplated by this Agreement, and if the transactions contemplated hereby are not consummated for any reason, the Receiving Party shall either return to the Disclosing Party, without retaining a copy thereof, or destroy any schedules, documents or other written or electronically stored information constituting Confidential Information (or prepared based upon such Confidential Information) in connection with this Agreement and the transactions contemplated hereby and the negotiations preceding this Agreement. Without limiting the generality of the foregoing, the Receiving Party shall be permitted to disclose any Confidential Information to such of its Affiliates, officers, directors, employees, agents, lenders and representatives (collectively, "Representatives") as have a need to know such Confidential Information, provided such Representatives shall be informed that disclosure of such Confidential Information by such Representatives would be in contravention hereof and the Receiving Party shall be responsible for any disclosure prohibited hereby by any of its Representatives. Notwithstanding the foregoing, the Receiving Party shall not be required to keep confidential or return any information which (i) is known or available through other lawful sources, not bound by a confidentiality agreement with the Disclosing Party, or (ii) is or becomes publicly known other than as a result of the disclosure by the Receiving Party or its Representatives, or (iii) is required to be disclosed pursuant to an order or request of a judicial or governmental authority, an arbitrator or arbitration panel or a self-regulatory body or pursuant to any law or regulation in any jurisdiction (provided the Disclosing Party, to the extent permitted by law, is given reasonable prior written notice), or (iv) is developed by the Receiving Party independently of, and is not based upon, the Confidential Information.

7.2     For the avoidance of doubt, all methodologies, strategic and business plans drawn up by Castlewood for and in the performance of this Agreement shall remain the sole property of Castlewood and nothing shall be construed as granting the Company a license to use such information in any form, after the termination of this Agreement without the consent of Castlewood.

7.3     Castlewood shall be authorized to refer to the Company as a client in its marketing literature.

7.4     Subject to the following proviso, both during and for a period of twelve months after any termination of this Agreement, the Company shall not solicit in any way the employment of, or induce (or assist any other Person to so solicit or induce) any officer or employee of Castlewood to cease to be such an officer or employee, it being understood that this clause 7.4 shall not apply in the event of any termination of this Agreement pursuant to Section 5.1 or by the Company pursuant to Section 5.2.

8.     **Assignment and delegation**

8.1     Neither party shall assign or deal in any other manner with any of their rights or obligations under this Agreement without the prior written consent of the other, such consent not to be unreasonably withheld or delayed, provided that, subject to clause 10.2, Castlewood shall have

8

Confidential
ST-006893

the authority to delegate to any person such functions as it deems necessary for the performance of its obligations under this Agreement.

## 9.    Remuneration of Castlewood

9.1    In consideration for providing the Services, Castlewood shall be remunerated by the Company in accordance with the terms set out in Schedule 3.

## 10.    Indemnification and Limitation of Liability

10.1    The Company shall indemnify Castlewood against any liability which Castlewood may reasonably incur as a result of performing its obligations under this Agreement; provided, however, that such indemnity shall not apply to any liability to the extent such liability has been finally adjudicated by a court of competent jurisdiction to have resulted from the willful misconduct of Castlewood (including any consultants, independent contractors or other third parties engaged by it) or material breach of this Agreement by Castlewood.

10.2    Castlewood shall indemnify the Company against any liability which the Company may reasonably incur to the extent such liability has been finally adjudicated by a court of competent jurisdiction to have resulted from: (i) any material breach of this Agreement by Castlewood, (ii) any willful misconduct by Castlewood in the performance of its obligations under this Agreement, and (iii) any material breach of this Agreement by willful misconduct attributable to any consultants, independent contractors or any third party engaged by Castlewood under clause 8 hereof.

10.3    Castlewood shall at all times maintain errors and omissions insurance for its actions hereunder with such third-party insurers and in such amounts (including as to deductibles and caps) as are approved from time to time by the Company (such approval not to be unreasonably withheld). Castlewood shall at all times maintain a fidelity bond or fidelity insurance coverage inuring to the benefit of the Company with a penal sum or limit of liability, as the case may be, of at least $1,000,000.

10.4    In the case of any claim asserted by a third party against a party entitled to indemnification under this Agreement (the "Indemnified Party"), notice shall be given by the Indemnified Party to the party required to provide indemnification (the "Indemnifying Party") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and the Indemnified Party shall permit the Indemnifying Party (at the expense of such Indemnifying Party) to assume the defense of any claim or any litigation resulting therefrom, provided that (i) the counsel for the Indemnifying Party who shall conduct the defense of such claim or litigation shall be reasonably satisfactory to the Indemnified Party, (ii) the Indemnified Party may participate in such defense at such Indemnified Party's expense, and (iii) the failure by any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its indemnification obligation under this Agreement except to the extent that such omission results in

9

Confidential
ST-006894

a failure of actual notice to the Indemnifying Party and such Indemnifying Party is materially damaged as a result of such failure to give notice. Except with the prior written consent of the Indemnified Party, no Indemnifying Party in the defense of any such claim or litigation, shall consent to entry of any judgment or order, interim or otherwise, or enter into any settlement that provides for injunctive or other nonmonetary relief affecting the Indemnified Party or that does not include as an unconditional term thereof the giving by each claimant or plaintiff to such Indemnified Party of a release from all liability with respect to such claim or litigation. In the event that the Indemnifying Party does not accept the defense of any matter as above provided, the Indemnified Party shall have the full right to defend against any such claim (at the expense of such Indemnifying Party) or demand and shall be entitled to settle or agree to pay in full such claim or demand. Notwithstanding the foregoing, the Indemnifying Party shall still provide indemnification to the Indemnified Party as provided in paragraph 10.2 and 10.3 of this Article 10. In any event, the Indemnifying Party and the Indemnified Party shall cooperate in the defense of any claim or litigation subject to this Article 10 and the records of each shall be available to the other with respect to such defense.

10.5   Neither party shall be liable to the other party for loss of profits or revenue, loss of goodwill, loss of anticipated savings or for any type of special, indirect or consequential loss even if such loss was reasonably foreseeable or the breaching party had been advised of the possibility of the non-breaching party incurring the same.

10.6   Castlewood's entire liability to the Company or its Affiliates in respect of any breach of this Agreement or any act or omission in connection with this Agreement shall be limited to damages of an amount not exceeding the fees paid to Castlewood during the previous 12 calendar months.

10.7   If a number of breaches of this Agreement and/or omissions give rise to substantially the same loss, then they shall be regarded as giving rise to only one claim under this Agreement and such claim shall be limited to damages of an amount not exceeding the fees paid to Castlewood during the previous 12 calendar months.

10.8   If a number of breaches of this Agreement and/or omissions give rise to claims for damages then the damages payable by Castlewood in respect of those claims shall not in aggregate exceed the fees paid to Castlewood during the previous 12 calendar months.

**11.   Force Majeure**

11.1   If a party's performance obligations under this Agreement are affected by Force Majeure, it shall immediately notify the other party.

11.2   A party shall not be in breach of this Agreement by reason of the failure or delay in performance of any obligations to the extent that such failure or delay is caused by Force Majeure, and the time for performance shall be extended accordingly.

10

Confidential
ST-006895

11.3    If a party's performance obligations are affected by Force Majeure for a continuous period in excess of thirty days, the parties shall enter into bona fide discussions with a view to alleviating the situation or to agreeing upon such alternative arrangements as may be fair and reasonable. If the parties fail to agree upon a course of action within a further period of thirty days, then either may immediately terminate this Agreement by serving notice on the other.

## 12.    Instructions

12.1    The Company undertakes to respond promptly to all requests for instructions from Castlewood.

12.2    Any written instructions given to Castlewood by the Company Representative shall be deemed to be instructions of the Company.    Furthermore, any matter referred to the Company Representative shall be deemed properly communicated to the Company.

## 13.    Notices

13.1    Notices, statements and other communications under this Agreement shall be in writing and shall be served at the addresses listed below (or to such address as is notified in writing by one party to the other from time to time) by hand, facsimile, recorded delivery or by first class post:

|          |          |
|----------|----------|
| Company: | Seaton Insurance Company |
|          | c/o GSC Partners Europe Ltd. |
|          | 68 Pall Mall, First Floor |
|          | London, SW1 Y5ES |
|          | United Kingdom |

| | |
|---|---|
| Attention: | Mayur Patel |
| Facsimile: | (+44) 207 968 3636 |

With a copy to the Company Representative.

| | |
|---|---|
| Castlewood: | Castlewood (US) Inc. |
| | 7901 4th Street N. Suite 203 |
| | St. Petersburg, FL 33702 |

| | |
|---|---|
| Attention: | Karl Wall |
| Facsimile: | (727) 576-3627 |

13.2    Notices shall be deemed served:

13.2.1    when delivered by hand, at the time of delivery;

11

Confidential
ST-006896

13.2.2 when sent by facsimile, at the time of a fully complete transmission, as documented by receipt of confirmation generated by the sender's or recipient's facsimile equipment; provided that a facsimile sent outside normal business hours on a business day at the place of receipt will be deemed sent at the opening of normal business hours on the next business day;

13.2.3 when sent by recorded delivery or first class post, at the expiration of 48 hours from despatch.

## 14.    Further assurance and good faith

14.1    Each party agrees from time to time to do all such acts and to execute and deliver all such instruments as may be required or reasonably requested by the other party to establish, maintain and protect the rights and remedies of the other party and to carry out and effect the intent and purpose of this Agreement. Each of the parties agrees with the other that it will at all times take all steps so as to ensure that the provisions that are to be performed by it are properly performed in good faith.

## 15.    General

15.1    This Agreement sets out the entire understanding of the parties with respect to the matters with which it deals and may be amended or modified only by written instrument duly executed by each party.

15.2    Each party acknowledges that it has not relied upon or been induced to enter into this Agreement by any representation other than a representation expressly set out in this Agreement and neither party shall be liable to the other in equity, contract, tort or in any other way for any representation not expressly set out in this Agreement.

15.3    If any provision of this Agreement shall in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that provision or part shall to that extent be deemed not to form a part of this Agreement and the enforceability of the remainder of this Agreement shall not be affected.

15.4    The rights which each party has under this Agreement shall not be prejudiced or restricted by any indulgence or forbearance extended to the other party. No waiver by any party in respect of a breach shall operate as a waiver in respect of any subsequent breach.

15.5    This Agreement may be executed in counterparts all of which together shall constitute one and the same instrument and all counterparts shall be deemed to be originals.

3558167.4
SSL-DOCS2 70261932v3

1/18/2006

**Confidential
ST-006897**

15.6  This Agreement shall be governed by and construed in accordance with New York law without reference to that State's law concerning conflicts of law, and any dispute arising in connection with this Agreement is subject to the non-exclusive jurisdiction of the New York courts.

15.7  In the event that any differences arising between the Company and Castlewood under this Agreement, such differences shall be submitted to arbitration. The Company and Castlewood shall each nominate an arbiter, and the arbiters shall then choose an umpire before they enter upon arbitration. In the event that either party fails to name its arbiter within thirty (30) days of the other party requesting it to do so, the latter shall name both arbiters, and both arbiters shall choose the umpire before entering upon arbitration. If the two arbitrators are unable to agree upon an umpire, the American Arbitration Association shall choose the umpire at the request of either party, but nothing herein shall be considered an election by the parties that the arbitration proceed in accordance with the rules or procedures of the American Arbitration Association, other than the rules and procedures applicable to appointment of the umpire. The arbiters shall then consider the differences, and failing to agree, shall submit only such questions upon which they disagree to the umpire. The arbiters and the umpire shall be active or retired disinterested executive officers of insurance or reinsurance companies authorized to transact business in the United States. The arbiters and the umpire are relieved from all judicial formalities and may abstain from following the strict rules of law. A decision of the majority in writing when filed with the Company and Castlewood, shall be final and binding upon both. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the parties or their assets. Any arbitration shall take place in New York, New York. Each party shall bear the expense of its own arbiter, or one-half the expense of the two arbitrators if both are appointed by the requesting party as provided above, and shall jointly and equally bear the expense with the other the expense of the umpire.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

SEATON INSURANCE COMPANY

By: _____
Name:  R. L. BARCLAY
Title:  PRESIDENT

CASTLEWOOD (US) INC.

By: _____

13

Confidential
ST-006898

Name:  *KARL J. WALL*
Title:  *PRESIDENT & COO*

3666167.4
SSL-DOCS2 7025195246

1/18/2006

Confidential
ST-006899

**SCHEDULE 1**

**The Services**

Subject always to the Company Representative's direction, Castlewood shall be authorized to carry out the Services set out below.

1.    Processing and accounting services

1.1    Processing of premiums and Claims.

1.2    Maintenance of Company ledgers.

1.3    Payment of balances to reinsurers and the recovery of amounts due from insurers, reinsurers, brokers and other insurance intermediaries.

1.4    Maintenance of a reinsurance credit control system.

2.    Management services

2.1    Advising the Company on overall strategy.

2.2    Maintaining and giving instructions pursuant to the banking resolutions provided by the Company from time to time on bank accounts in the name of the Company at such banks as the Company may from time to time designate (all funds received and disbursed by Castlewood in carrying out the Business of the Company shall be deposited in or drawn from, as the case may be, such accounts).

2.3    Submitting to Regulatory Authorities all relevant returns (including but not limited to statutory unaudited annual and quarterly statements and audited statutory annual statements) received in respect of the Company and dealing with any inquiries which arise.

2.4    Advising the Company as soon as any legislative or regulatory proceedings or complaints or any other material matters relating to the Company come to the attention of Castlewood.

2.5    Provision of facility for meetings of the Board or shareholders of the Company.

2.6    Provision of information required by the Company's tax advisors for preparation of the Company's corporation tax returns.

2.7    Monitoring the Company's solvency.

3558167.4
SSL-DOCS2 7026193:2v3

1/18/2008

**Confidential
ST-006900**

3.    **Claims Servicer Function**

3.1    Castlewood will review the Claims Servicer's performance in the following:

- participation in any scheme or arrangement designed to mitigate or avert Claims or increase salvage;

- exercise of rights of subrogation against third parties in the name of the Company;

- carrying out the review, handling and adjusting of Claims;

- carrying out any ancillary Claims processing work relating to the Run-Off Business;

- liaise with professional advisers in respect of disputed Claims in terms of providing information, initial instructions;

- reviewing the Company's outstanding Claims reserves and report the findings; and

- reviewing and comment on the IBNR proposed by the Company's actuaries.

    The final authority for the acceptance and payment of claims rests with the Company.

4.    **Limitation of Authority**

4.1    For the completion of contracts of insurance and reinsurance, Castlewood shall not:

- enter into any new contract;
- extend the periods of cover under existing contracts; or
- increase the limits of liability under existing contracts,

    without the prior written approval of the Company Representative.

5.    **Commutations**

5.1    Identifying targets for commutation according to, inter alia, the following criteria:

16

3566167.4
SSL-DOCS2 70261952v3

1/19/2006

**Confidential
ST-006901**

- nature of cedent/assured;
- risk profile;
- reserve levels; and
- deterioration forecasts.

5.2    Presenting a schedule of targets and a commutations status report at each Board meeting.

5.3    Negotiation and drafting of commutation agreements to the extent permitted under the Reinsurance Agreements.

## 6.    Reports to the Company

6.1    Provision of statements, reports and accounts relating to the Business as follows:

| | Frequency | Service Level (Business Days after period ended) |
|---|---|---|
| Claims received, agreed, rejected | Quarterly | 30 |
| Commutations progress | Quarterly | 30 |
| Problematic reinsurance collections | Quarterly | 30 |
| Reinsurance recoveries submitted | Quarterly | 30 |
| Credit notes received | Quarterly | 30 |
| Cash received from reinsurers | Quarterly | 30 |
| Cashflow statement | Quarterly | 30 |
| Management accounts | Quarterly | 30 |
| Claims exception report | Quarterly | 30 |
| Details of new claims | Quarterly | 30 |
| Analysis of LMX reinsurance cover | Quarterly | 30 |
| Underwriting Development Statistics | Quarterly | 30 |
| Asbestosis and Environmental Pollution Analyses | Quarterly | 60 |
| Shareholder Report | Annually | 60 |
| IBNR recommendation | Annually | 60 |
| Unaudited and audited statutory annual statements | Annually | as required by law |
| Unaudited statutory quarterly statements | Quarterly | as required by law |

6.2    Castlewood shall also provide, on behalf of the Company, such statements, reports and accounts relating to the Business to National Indemnity Company ("NIC") as and when the same are required to be delivered to NIC by the Company pursuant to the terms of the Reinsurance Agreements.

3556187.4
SSL-DOCS2 70261952v3

1/18/2006

Confidential
ST-006902

6.3    The service levels are calculated on the following assumptions:

- that each monthly period will be closed on the last Friday of each calendar month; and

- that all Data is stored on the System.

### 7.    Treasury and cash management functions

7.1    Liaison with bankers to ensure smooth running of account.

7.2    Carrying out monthly bank reconciliations.

7.3    Investment of Company funds on short term deposit (as directed by the Company).

### 8.    Corporate functions

8.1    Liaison with the Regulatory Authorities on the Company's behalf in connection with the Business.

3556167.4
SSL-DOCS2 702619.2v3

1/18/2008

Confidential
ST-006903

## SCHEDULE 2

### The Company Representative

The Company Representative shall be _____ or such other individual as may be advised to Castlewood by the Company from time to time in writing.

3556167.4
SS1-DOCS2 702619:52v3

1/16/2006

Confidential
ST-006904

**SCHEDULE 3**

**Remuneration of Castlewood**

1.    Annual fee

1.1  In consideration for providing the Services under this Agreement, and subject to the terms of this Schedule, the Company shall pay to Castlewood the fees as follows: (all amounts are in U.S. Dollars):

| | |
|---|---|
| January 18, 2006 – December 31, 2006 | $1,773,000 (payable in equal quarterly payments on January 27, April 1, July 1 and October 1) |
| January 1, 2007 – December 31, 2007 | $1,810,000 (payable in equal quarterly payments on January 1, April 1, July 1 and October 1) |
| January 1, 2008 – December 31, 2008 | $1,755,000 (payable in equal quarterly payments on January 1, April 1, July 1 and October 1) |

An adjustment will be made for reasonable Claims Servicer fees paid by the Company provided they have been agreed to by Castlewood in advance and further provided that the total fees to be paid to Castlewood and the Claims Servicer in respect of each year shall not exceed the amounts defined above for each such year.

1.2  In the event that there is a substantial change in the nature of the Business or the quantity of the Services provided by Castlewood, then each party will at the request of the other party seek in good faith to renegotiate the annual fee.

1.3  For periods subsequent to January 1, 2009, the annual fee shall be mutually agreed to by Castlewood and the Company.

2.    **Work outside the scope of the Agreement**

2.1  If Castlewood carries out any work not covered by the Services, then the Company shall reimburse Castlewood for such work on a time and materials basis at its current rates (which shall be subject to variation from time to time). Castlewood shall be entitled to invoice the Company on a monthly basis and the Company agrees to pay such invoices within fifteen days of receiving each invoice.

2.2  Any such additional work shall be carried out on the terms set out in this Agreement, including for the avoidance of doubt clause 10.

3568167.4
SSL-DOCS2 7C261952v3

1/18/2006

**Confidential**
**ST-006905**

2.3    Subject to the prior approval of the Company, Castlewood shall be reimbursed for its out-of-pocket expenses incurred in connection with the transition from the prior administrator to Castlewood.

**3.    Third party costs**

3.1    Fees include the staff and related costs of Castlewood in providing the Services.  For the avoidance of doubt, Castlewood's fees do not include third party costs and expenses which will be met directly by the Company including but not limited to:

      3.1.1    subscriptions and directors' fees;

      3.1.2    legal, actuarial, audit and other third party professional fees;

      3.1.3    loss adjustment and claims-related expenses paid to third parties;

      3.1.4    overseas travel undertaken at the request of (or with the prior approval of) the Company Representative;

      3.1.5    the costs of travel, subsistence and accommodation incurred by Castlewood personnel having to conduct work at the request of (or with the prior approval of) the Company Representative, away from their normal office locations.

      3.1.6    the cost of the Company's triennial reviews.

**4.    VAT**

4.1    Fees and rates referred to in the Agreement do not include any VAT, sales tax or other tax which, if applicable, shall be payable by the Company and added to such fees at the rate in force at the time they become due.

**5.    Conditions of payment**

5.1    The fees pursuant to Section 1.1 of this Schedule 3 are payable in advance, provided that if this Agreement is terminated for any reason prior to the end of the then current month or quarterly period, as applicable, with respect to which such period any such payment has previously been made, Castlewood shall, promptly following such termination, refund a pro-rata portion of such fee to the Company (based on the number of days elapsed/not-elapsed as of the effective date of such termination).

21

**Confidential
ST-006906**

5.2    All fees payable to Castlewood under this Agreement shall be paid in U.S. dollars and are deemed to accrue from day to day.

5.3    Time for payment is of the essence. Fees (or refunds) which are not paid by their respective due date shall accrue interest from day to day at a rate of 2% above the then current prime rate of Citibank N.A.

5.4    All such fees shall be payable at the address of Castlewood given for the purposes of notices under this Agreement or at such address as may be notified in writing by Castlewood to the Company from time to time.

3556167.4
SSL-DOCS2 70261952v3

1/18/2006

Confidential
ST-006907